EXHIBIT A

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

CONFORMED COPY
ORIGINAL FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

FEB 01 2012

John A. Clarke, Executive Officer/Clerk
BY _____, Deputy
Shaunya Wesley

**NOTICE TO DEFENDANT:** NORTHERN TRUST CORPORATION;
*(AVISO AL DEMANDADO):* NORTHERN TRUST COMPANY; PENSION
CONSULTING ALLIANCE, INC.; and DOES 1 - 50, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* THE PEOPLE OF THE
STATE OF CALIFORNIA

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO!* Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Stanley Mosk Courthouse<br>111 North Hill Street<br>Los Angeles 90012 | **CASE NUMBER:**<br>*(Número del Caso):*<br>BC 478 165 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Carmen A. Trutanich, City Attorney            (213) 978-8100  F:213-978-8312
Los Angeles City Attorney's Office
200 North Main Street, 800 City Hall East
Los Angeles, CA 90012

DATE:                                                        Clerk, by _____, Deputy
*(Fecha)* FEB 01 2012                                        *(Secretario)* Shaunya Wesley       *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):
3. ☐ on behalf of (specify):

under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
        ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
        ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
        ☐ other (specify):

4. ☐ by personal delivery on (date):

[SEAL]

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465

Exhibit A Page 10

1    CARMEN A. TRUTANICH, City Attorney (State Bar No. 86629)
     LOS ANGELES CITY ATTORNEY'S OFFICE
2    800 City Hall East
     200 North Main Street
3    Los Angeles, CA 90012
     Telephone:    (213) 978-8100
4    Facsimile:    (213) 978-8312

5    JORDAN S. STANZLER    (State Bar No. 54620)
     MELINDA JANE STEUER   (State Bar No. 216105)
6    JEFFREY M. CURTISS    (State Bar No. 239199)
     STANZLER LAW GROUP
7    2275 E. Bayshore Road, Suite 100
     Palo Alto, CA 94303
8    Telephone:    (650)739-0200
     Facsimile:    (650)739-0916
9    Jstanzler@Stanzlerlawgroup.com

10   Attorneys for Plaintiff

11

CONFORMED COPY
ORIGINAL FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

FEB 01 2012

John A. Clarke, Executive Officer/Clerk
BY _____, Deputy
    Shaunya Wesley

COPY

12         IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

13           IN AND FOR THE COUNTY OF LOS ANGELES

14

| | |
|---|---|
| 15   THE PEOPLE OF THE STATE OF CALIFORNIA, | Case No.    BC 478165 |
| 16          Plaintiff, | COMPLAINT FOR: |
| 17     vs. | 1.    UNLAWFUL BUSINESS PRACTICES (Bus. & Prof. Code § 17200, *et seq.*) |
| 18   NORTHERN TRUST CORPORATION; NORTHERN TRUST COMPANY; PENSION CONSULTING ALLIANCE, INC.; and DOES 1 - 50, inclusive, | 2.    VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT (Cal. Gov. Code § 12651) |
| 21         Defendants. | [NO FEE REQUIRED PURSUANT TO GOVERNMENT CODE SECTION 6103] |

22

23

24

25

26

27

28

Complaint

TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Northern Trust's Conflict of Interest: "Heads We Win. Tails You Lose" . . . . . . . 3

PARTIES AND CAPACITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ALLEGATIONS COMMON TO ALL CAUSES OF ACTION . . . . . . . . . . . . . . . . . . 9

    A.    Northern Trust's Fiduciary and Contractual Relationship With LACERS . . . . . . 9

    B.    General Background On Securities Lending Agreements . . . . . . . . . . . . . . . . . . 10

    C.    Northern Trust Promised to Preserve LACERS' Principal Investment and
        Maintain Liquidity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    D.    Northern Trust Represented that LACERS Was Protected From "Potential
        Securities Lending Risks" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    E.    As Early As 2004, Northern Trust Identified The Housing Bubble And Knew The
        Economic Risk It Posed To LACERS' Cash Collateral Investment In the Notes of
        Companies That Depended Upon Revenue From Mortgage Originations . . . . . 16

    F.    Northern Trust Failed to Provide Reports on Securities Lending . . . . . . . . . . . 20

    G.    Northern Trust Failed to Monitor Transactions Comprising Nearly Half of
        its Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    H.    Northern Trust Wrote Inadequate, Illusory Investment Guidelines Which Created
        The False Impression That The Investments Were "Low Risk" . . . . . . . . . . . . 22

    I.    Northern Trust Invested in Notes Tied to the Mortgage-Origination Business
        Without Disclosing the Huge Risks Identified By Its Chief Economist . . . . . . . 25

    J.    Northern Trust Kept LACERS in the Dark About Risky Investments that Northern
        Trust Made for LACERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    K.    Northern Trust Misrepresented That The Investment in GreenPoint
        Mortgage Funding Trust Was "Low Risk," Knowing That it Was A Very High
        Risk Investment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    L.    Northern Trust Misrepresented That The Investment in Washington Mutual Bonds
        Was A "Low Risk," Knowing That It Was A Very High Risk Investment . . . . 40

    M.    Northern Trust Misrepresented That The Investment in CIT Group Bonds Was
        "Low Risk," Knowing That It Was A Very High Risk Investment . . . . . . . . . . 46

    N.    Northern Trust Misrepresented That The Investment in Lehman Brothers Bonds
        Was "Low Risk," Knowing That It Was A Very High Risk Investment . . . . . . 47

i

O.  Northern Trust's Breach of Its Contractual and Fiduciary Duties Arose Out Of Its Multiple Conflicts Of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

P.  Northern Trust Declared a "Collateral Deficiency" And Made a $150 Million Cash Contribution to the Collateral Pools . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Q.  Northern Trust Convinced LACERS and Other Pension Funds Not To Liquidate Their Investments In Lehman Securities And/Or The Commingled Pools . . . . . 55

R.  Northern Trust Made Evasive and Misleading Communications to LACERS . . 57

S.  Northern Trust Continued to Provide Misleading Assurances to LACERS in 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

T.  Northern Trust Made Knowingly False Statements in 2010 . . . . . . . . . . . . . . . 60

U.  PCA Failed to Review or Monitor Northern Trust's Investments in the Securities Lending Program While Charging Fees for This Service . . . . . . . . . . . . . . . . . . 62

V.  PCA Failed to Perform the Duties Required Under LACERS' Investment Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

FIRST CAUSE OF ACTION
VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200
(Plaintiff People of the State of California Against Northern Trust) . . . . . . . . . . . . . . . . . . . . . 63

SECOND CAUSE OF ACTION
VIOLATION OF GOVERNMENT CODE § 12651, et seq.
(Plaintiff People of the State of California Against Northern Trust) . . . . . . . . . . . . . . . . . . . . . 66

THIRD CAUSE OF ACTION
VIOLATION OF BUSINESS & PROFESSIONS CODE § 17200
(Plaintiff People of the State of California Against PCA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

FOURTH CAUSE OF ACTION
VIOLATION OF GOVERNMENT CODE § 12651, et seq.
(Plaintiff People of the State of California Against PCA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

DEMAND FOR JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

ii

1

## **EXHIBIT LIST**

2

3   **EXHIBIT A:** Master Custody Services contract effective August 1, 2003 through July 31,2006,

4   including Amendment No.1, extending the effective date from August 1, 2006 through July 31,2007,

5   Amendment No.2, extending the effective date from August 1, 2007 through July 31, 2008 and

6   Amendment No.3, extending the effective date from August 1,2008 through July 31,2011.

7

8   **EXHIBIT B:** Securities Lending Services contract effective August 1, 2003 through July 31, 2006,

9   including Amendment No.1, extending the effective date from August 1, 2006 through July 31,2007,

10  Amendment No.2, extending the effective date from August 1, 2007 through July 31, 2008 and

11  Amendment No.3, extending the effective date from August 1, 2008 through July 31, 2011.

12

13  **EXHIBIT C:** General Pension Fund Consulting Services contract between Pension Consulting

14  Alliance, Inc. and Los Angeles Employees' Retirement System effective July 1, 2006 through

15  June 30, 2009, subsequently extended through December 31, 2010.

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

**"You Are Protected From Potential Securities Lending Risks." Northern Trust Company Proposal for Master Trust/Custodial Services and Securities Lending, October 10, 2006, at A126.**

\*\*\*

THE PEOPLE OF THE STATE OF CALIFORNIA bring this action for damages, civil penalties and/or other equitable relief against the defendants NORTHERN TRUST CORPORATION, NORTHERN TRUST COMPANY (collectively "Northern Trust"), PENSION CONSULTING ALLIANCE, INC. ("PCA") and DOES 1 through 50, inclusive, and allege on information and belief, except as to those paragraphs that are based on personal knowledge, as follows:

## INTRODUCTION

1.     Northern Trust made false claims and statements regarding its management of the assets of the Los Angeles City Employees' Retirement System ("LACERS") in order to receive payments as a custodian bank and securities lending agent.

2.     LACERS is a public pension fund created, established and adopted pursuant to and by the authority of the City Charter of Los Angeles, Article XI, for the benefit of the public employees of the City of Los Angeles. LACERS is, and at all times relevant herein was, a defined benefit retirement plan which manages retirement benefits for more than 43,000 active public employees and their families.

3.     Northern Trust promised and represented that the investments it made for LACERS in the securities lending program were "low risk," and "safe," involving "a stringently managed risk" that "enhanced performance" with "minimized risk." Northern Trust represented that "you [LACERS] are protected from potential securities lending risks."

4.     These representations were false and made in knowing or reckless disregard for the truth. Northern Trust failed to disclose to LACERS that Northern Trust selected highly risky investments that Northern Trust knew were unsuitable for LACERS and in violation of the representations which Northern Trust made to LACERS.

5.     In or about late October, 2010, Northern Trust provided LACERS with a

Exhibit A Page 15

"Supplemental Performance Information– LACERS Custom Collateral Fund," which stated that LACERS had sustained the following "realized losses" as of October 25, 2010:

| | |
|---|---|
| Washington Mutual Bank | $46,022,371 |
| CIT Group | $21,439,485 |
| Lehman Brothers | $19,595,132 |
| Greenpoint Mortgage Funding | $ 6,696,597 |
| Sallie Mae | $ 1,954,954 |
| Bear Stearns | $ 23,363.00 |
| Royal Bank of Canada | $ 8,250.00 |
| AT&T Inc. | $ 5,910.00 |
| Credit Suisse USA | $ 5,474.00 |
| Wachovia Corp. | $ 2,730.00 |
| TOTAL | $95,754,266 |

A.   **Northern Trust's Conflict of Interest: "Heads We Win. Tails You Lose"**

6.   Northern Trust demanded payment from LACERS for these losses to be made prior to July 8, 2011.  LACERS made the payment on July 7, 2011 in the sum of $95,662,812.92, under protest.

7.   These losses were caused by Northern Trust's mismanagement of its Securities Lending Program for LACERS.  Under that program, Northern Trust acted as custodian, investment advisor, fiduciary, and trustee of certain funds belonging to LACERS.  Northern Trust warranted that it would invest these funds in such a way as to produce "almost risk-free returns" with "minimized risk".   Instead, Northern Trust produced substantial losses by investing the assets of LACERS in unsuitable, high-risk investments without the ability the monitor the performance of those investments.

8.   This lawsuit seeks civil penalties and treble damages for false claims Northern Trust submitted in pursuit of fees under the Securities Lending Program, as well as civil penalties and restitution for unlawful and unfair business practices that caused these losses.

9.   This lawsuit also seeks similar relief from Pension Consulting Alliance, Inc.

("PCA") resulting from PCA's submission of false claims and unlawful and unfair business practices. PCA contracted with LACERS to provide expertise and advice on LACERS' investments and to act as a "watchdog." PCA also acted as fiduciary for LACERS. PCA collected fees while knowingly or recklessly failing to advise LACERS that Northern Trust was engaging in inappropriate, high-risk investments in the Securities Lending Program.

10.     The losses alleged herein occurred in the context of the investment of collateral received by a lender of securities, LACERS, and invested by a securities lending agent, Northern Trust. The New York Times described the role of the securities lending agent in this context in an October 10, 2010 article entitled *House Advantage – Banks Shared Clients' Profits, But Not Losses*. The article refers to the securities lending agent's strategy as follows: "Heads, we win together. Tails, you lose alone". That description applies to the activities and conduct of Northern Trust, as alleged in this complaint.

11.     The article states that the trades and investments made through the practice of securities lending "were supposed to be safe enough to make a little extra money at little risk."

12.     Northern Trust specifically informed LACERS that Northern Trust's securities lending program is "**[a] low risk investment activity designed to enhance the return of an overall investment program.**" *An [sic] Review of Global Securities Lending for Los Angeles City Employees' Retirement System*, by Don Anderson, Vice-President-Global Securities Lending Group, June 26, 2006, p. 3.

13.     Northern Trust further advised LACERS that "**you are protected from securities lending risks.**" Proposal for Master Trust Custodial Services and Securities Lending, October 10, 2006, at A126.

14.     In practice, however, as described more fully below, Northern Trust engaged in highly risky investments because it shared with LACERS in profits from these investments, but did not share with LACERS in the losses from these investments. Northern Trust placed its interests in making a profit ahead of the interests of LACERS in preserving capital because Northern Trust had, from its point of view, nothing to lose and everything to gain by making risky investments.

Exhibit A Page 17

15.     Consequently, Northern Trust knowingly and recklessly breached its contractual obligation and fiduciary duty to minimize risk and preserve the assets of LACERS.

16.     Northern Trust and PCA failed to advise LACERS that Northern Trust was engaged in highly risky investments.  Northern Trust misled LACERS by representing that it provided "low risk," "almost risk-free" or "minimized risk" investments.  PCA misled LACERS in misrepresenting that Northern Trust provided "money market-like" investments. In actuality, Northern Trust invested in high-risk, illiquid securities. The risk and illiquidity of these investments increased over time.

17.     In *How Securities Lending Programs Went Astray*, published on March 9, 2009 in Pensions & Investments, Mark Anson wrote: "there are two ways to increase the investment outcome: the custodial bank can invest the lending collateral in securities with a longer maturity or invest the collateral in securities that have a lower credit quality.  Both methods require more risk."

18.     Mr. Anson continued: "Instead of investing in short-term liquid instruments, custody banks began investing. . . in asset-backed and mortgage-backed securities.  Custody banks shifted their securities lending instruments from primarily short-term government securities and AAA-rated commercial paper to instruments that had longer duration and more credit risk . . . . This worked for a while, but unfortunately, the party came to an end with the credit and liquidity crisis that began in 2007."

19.     Mr. Anson also identified the incentives that encouraged custodial banks to take more risks: "The risk of the lending program is on the pension fund.  Any losses to the securities lending program are borne by the pension fund, but to the extent that there are profits, the custody bank shares in the pool.  This type of free option provides an incentive to the custody bank to take more risk."

20.     Northern Trust kept LACERS in the dark about the investments it made until mounting and staggering losses compelled Northern Trust to provide rudimentary reporting of its activities.

21.     Northern Trust knowingly submitted false claims and documents to obtain a

Exhibit A Page 18

payment of over $95 million from LACERS.

22.     Northern Trust purposely and recklessly breached its contractual obligations and fiduciary duties.

23.     Northern Trust mismanaged LACERS investments in the pursuit of higher fees and concealed this mismanagement through a variety of means, including the failure to disclose information and providing false statements and misrepresentations discussed more fully below.

## PARTIES AND CAPACITIES

24.     Plaintiff the People is the sovereign power of the State of California designated by the unfair competition law to be the complaining party in law enforcement actions brought under that statute. The Los Angeles City Attorney is statutorily authorized to bring actions in the name of the People of the State of California to enforce California's statutes governing unfair competition. (Bus. & Prof. Code, § 17204.)

25.     This lawsuit concerns the loss of funds from LACERS, a political subdivision over which Carmen A. Trutanich, as the City Attorney of Los Angeles, is the prosecuting authority. Pursuant to Gov. Code § 12652(b)(1), the Los Angeles City Attorney is authorized to bring suit under the California False Claims Act for recovery of such funds.

26.     Defendant Northern Trust Corporation is a Delaware corporation with a principal place of business in Chicago, Illinois. This corporation is a financial holding company and the corporate parent of Northern Trust Company, which is an Illinois corporation with its principal place of business in Chicago, Illinois. Northern Trust Corporation and Northern Trust Company are referred to herein as "Northern Trust". Plaintiff alleges on information and belief that both corporations were equally involved in the acts alleged herein and Plaintiff is unable to distinguish the acts of one from the acts of the other.

27.     Northern Trust provides asset investment and management services for institutions worldwide, including pension funds such as LACERS, and is authorized to transact business and is transacting business in the State of California. At all times relevant herein, Northern Trust served as a securities lending agent for LACERS and all direct and indirect

participants in Northern Trust's securities lending program ("SLP"). In connection therewith, Northern Trust had the responsibility for administering the SLP, including negotiating and entering into agreements with securities borrowers, receiving borrowers' collateral, matching borrower loan requests with the eligible securities of LACERS and managing the risk associated with the investment of borrower's collateral.

28.     Northern Trust is a fiduciary to LACERS and was obligated to act with prudence, due care, good faith and loyalty in investing and managing LACERS' assets. At all times relevant herein, Northern Trust held itself out to have great experience and expertise in the areas of asset investment and management for pension funds such as LACERS. As a result of Northern Trust's representations regarding its experience and expertise, LACERS reposed great trust and confidence in Northern Trust, and relied upon Northern Trust to invest and manage its funds, assets, and investments, and for investment decisions. The relationship between LACERS and Northern Trust was fiduciary in nature. It was characterized by trust and confidence on the part of LACERS toward Northern Trust. This trust and confidence was encouraged by Northern Trust.

29.     Pension Consulting Alliance, Inc. ("PCA") is a corporation with its principal place of business, headquarters, and "nerve center" at 15760 Ventura Blvd., Encino, California 91436. As described in greater detail below, PCA provided consulting services to LACERS. Representatives of PCA from its Encino office contracted with LACERS to provide the services. The Encino office of PCA is the office of PCA's founder, managing director and principal. In applying to LACERS' Request for Proposal for General Pension Fund Consultant, PCA has warranted that its headquarters address is 15760 Ventura Blvd., Suite 700, Encino, California 91436.

30.     Since 1999, LACERS has retained PCA as a general investment consulting firm. The duties of PCA and services rendered include, but are not limited to: assisting LACERS in selection of a custodian, making asset allocation studies and recommendations, making investment structure analysis, producing asset/liability reports, preparing or reviewing investment policy statements, recommending performance benchmarks for asset classes and investment

managers, reviewing investment performance reports, recommending external investment managers, preparing profiles or analysis of recommended external managers, preparing guidelines for managers, checking compliance of managers with guidelines, attending Board meetings, advising on investment subjects, conducting educational programs for Board and staff, and providing research on investment topics.

31.    PCA has at all times alleged herein acted as a fiduciary to LACERS.

32.    The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of defendants named herein as Does 1 through 50, inclusive, are unknown to Plaintiff or Plaintiff is not aware of their causes of action against them at this time, and therefore sue said defendants by such fictitious names.  When the true names and capacities of said defendants have been ascertained, Plaintiff will pray leave to amend this Complaint accordingly.  Plaintiff is informed and believes and thereon alleges that each defendant designated herein as a Doe is legally responsible for the events and happenings hereinafter referred to, and legally caused injuries and damages proximately thereby to LACERS, and/or engaged in unlawful, fraudulent and/or unfair business practices as hereinafter alleged.

33.    Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, each of the defendants was the agent, servant, employee, delegatee, co-conspirator and/or joint-venturer of each of the remaining defendants and in doing the things alleged in this Complaint, was acting within the full course and scope of said agency, service, employment, conspiracy, delegation and/or joint venture.

## JURISDICTION AND VENUE

34.    Carmen A. Trutanich is the duly elected City Attorney of Los Angeles and is authorized by Government Code section 12652(b)(1) to enforce California's False Claims Act and Business and Professions Code section 17204 to bring actions in the name of the People of the State of California to enforce California's the Unfair Competition Law ("UCL").

35.    This Court has original subject matter jurisdiction pursuant to Article VI, Section 5 of the California Constitution because the damages set forth in the prayer for relief are in excess of twenty-five thousand dollars ($25,000.00).

36.     This Court has jurisdiction over Northern Trust because Northern Trust had, and continues to have, continuous and systematic contacts with the State of California in that Northern Trust transacted, and continues to transact business in the State of California with LACERS.

37.     This Court represents the proper venue since the misrepresentations and material omissions made by Northern Trust, the breaches of fiduciary duties as alleged herein, and the written contracts between LACERS and Northern Trust, were entered into and/or to be performed in the County of Los Angeles, State of California.  Likewise, the contract between LACERS and PCA was entered into and/or to be performed in the County of Los Angeles, State of California.  Venue in Los Angeles County is also proper pursuant to Code of Civil Procedure section 395.5.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.     Northern Trust's Fiduciary and Contractual Relationship With LACERS

38.     Northern Trust is a financial services firm and serves as one of the major custodians of investment accounts for large institutions, including public pension funds such as LACERS.

39.     In 1991, Northern Trust and LACERS entered into a written Master Custody Services contract.  That original contract was superceded by another Master Custody Services contract effective August 1, 2003 through July 31, 2006 ("Custody Agreement").  The Custody Agreement was modified by Amendment No. 1, extending the effective date from August 1, 2006 through July 31, 2007.  The Custody Agreement was later modified by Amendment No. 2, extending the effective date from August 1, 2007 through July 31, 2008.  The Custody Agreement was modified a third time, by Amendment No. 3, extending the effective date from August 1, 2008 through July 31, 2011.  (A true and correct copy of the Custody Agreement and Amendments 1, 2 and 3 are attached hereto and incorporated herein by reference as Exhibit "A".)

40.     Under the Custody Agreement, Northern Trust established an account to hold LACERS' assets as a vehicle for funding and managing LACERS' investments.  See Exhibit A, section 1(a).  Under the Custody Agreement, Northern Trust also agreed to be the "Master

Custodian" of LACERS' assets which it held in those accounts.  (*Id.*, preamble.)

41.     Northern Trust is a custodian, investment manager, trustee and fiduciary with respect to the assets.

42.     The Custody Agreement outlines typical fiduciary duties owed by a fiduciary, including:

"(e) Northern shall hold and safeguard the cash, securities, and other property in the Fund and shall collect the principal thereof when due."  (See Ex. A, section 1(e).)

"(n) Northern shall perform its responsibilities hereunder in a manner consistent with that of a professional custodian acting in the jurisdiction in which the assets are located with the care, skill, prudence and diligence under the circumstances then prevailing that a professional custodian acting in like capacity and familiar with such matters would use." (See Ex. A, section 1(n).)

43.     Additionally, under the Custody Agreement, the parties expressly contemplated that should LACERS participate in Northern Trust's SLP, the relationship between the parties would be fiduciary in nature.  Pursuant to the Custody Agreement, the parties agreed that "LACERS may appoint Northern as a lending *fiduciary* whereupon Northern shall lend securities of the account held by it, pursuant to a separate written agreement with the Board. As *securities lending agent*, Northern shall transfer the securities to the borrower and invest collateral received in exchange for the securities." (See, Ex. A, section 1(r); Emphasis added.)  The "separate written agreement" is Contract 304 for Securities Lending Services between the Northern Trust Company and The Board of Administration of LACERS, entered into at or about the same time as the Custody Agreement, with identical effective dates of August 1, 2003 through July 31, 2006, later extended by amendment to July 31, 2011.  (See Ex. B.)  Each of the foregoing agreements was entered into and to be performed in Los Angeles County.

**B.     General Background On Securities Lending Agreements**

44.     Securities lending was originated by large custodial banks and marketed to their institutional clients as a safe, essentially risk-free way to earn investment income on securities

Exhibit A Page 23

held in their investment portfolios.  Generally, under a securities lending agreement, the custodial bank, such as Northern Trust, lends its client's securities to borrowers.  The borrowers are typically "short sellers" who hope to sell the securities and then buy them back at a lower price, thereby creating a profit.  In exchange for lending the securities, the custodial bank receives collateral from the borrower in an amount greater than the market value of the securities being lent.  Collateral is often in the form of a cash payment in an amount equal to 102% of the value of the securities lent.  The cash collateral is then invested on the lender's behalf, either through a custom cash collateral account or another account holding commingled cash collateral received by the custodial bank on behalf of other lending clients, in fixed income securities and/or other debt instruments.  The profit generated from the investment of the cash collateral is then split between the custodial bank's client (the lender of the securities, like LACERS) and the custodial bank, after reimbursement is first made to the borrower of the securities, and the borrowed securities are returned to the lender.

45.     In a basic transaction, securities are lent short-term and collateralized by either cash or securities.  If securities are held as collateral, the loan transaction is complete.  If cash is taken as collateral, there is another leg to the loan transaction.

46.     The cash is invested typically in short-term money market securities.  The transaction is unwound when the borrowed securities are returned to the beneficial owner and the collateral is returned to the borrower.

47.     The Federal Deposit Insurance Corporation adopted the Federal Financial Institutions Examination Council's Policy Statement on Securities Lending on July 30, 1997 at 62 Fed. Reg. 40816, to explain the nature and purpose of security lending, which includes the following statements: "The objective of such lending is to receive a safe return in addition to the normal interest on dividends. . . .Generally, a lender institution will invest cash collateral in repurchase agreements, master notes, a short term investment fund, U.S. or Eurodollar certificates of deposit, commercial paper, or some other type of money market instrument." (emphasis added).  Thus, it is generally recognized and understood that the cash collateral received in a securities lending transaction will be invested in safe, short-term funds, such as

1   money market funds.

2   **C.   Northern Trust Promised to Preserve LACERS' Principal Investment and**
    **Maintain Liquidity**

3   48.   By the terms of the contracts between LACERS and Northern Trust, Northern

4   Trust served as a fiduciary to LACERS in connection with the management of the Securities

5   Lending Program and, in particular, the investment and management of LACERS' cash collateral

6   in securities issued by Washington Mutual Bank ("Washington Mutual"), Lehman Brothers

7   ("Lehman"), GreenPoint Mortgage Funding, Inc. ("GreenPoint"), CIT Group ("CIT"), and other

8   entities.

9   49.   As the "Investment Manager" charged with managing the investment of cash

10  collateral  for the benefit of both direct and indirect participants in the Securities Lending

11  Program, including LACERS, Northern Trust had a fiduciary duty to manage those investments

12  prudently and within the  purpose for which the Securities Lending Program was established.

13  That purpose was to "maximize current income" in a manner "consistent with the preservation of

14  capital and maintenance of liquidity."  "Cash collateral investments emphasize liquidity and

15  principal preservation as prime objectives."  (See Exhibit B, section B, p. 2, "Cash Collateral

16  Funds, Investment Objectives.")

17  50.   Northern Trust agreed to "indemnify" LACERS for "any losses, damages, costs

18  and expenses" resulting from Northern Trust's "failure to make a reasoned determination of the

19  quality and suitability of Collateral investments through adequate analysis of all material public

20  information available to [Northern Trust]." Exhibit B, section 16.1.

21  51.   As alleged herein, Northern Trust knowingly or recklessly breached its contractual

22  obligations to LACERS by failing to invest LACERS' cash collateral in safe, liquid instruments,

23  and failing to monitor LACERS' investments so that they remained safe and liquid.  Northern

24  Trust's knowing or reckless failure to appropriately invest and monitor LACERS funds caused

25  LACERS to incur significant losses.

26  **D.   Northern Trust Represented that LACERS Was Protected From "Potential**
    **Securities Lending Risks"**

27  52.   Since 1981, Northern Trust has been one of the largest providers of securities

28

Exhibit A Page 25

lending services for public pension funds, foundations, endowments and insurance companies. By December 31, 2007, Northern Trust's SLP boasted 664 clients, representing approximately $1.13 trillion of lendable securities.

53.     In its "Review of Global Securities Lending," dated June 26, 2006 Northern Trust represented that securities lending is "[a] low risk activity designed to enhance the return of an overall investment program."

54.     Northern Trust represented to LACERS, in its "Proposal for Master Trust Custodial Services and Securities Lending", dated October 10, 2006, page A 111, that Northern Trust had a "Flawless track record". Northern Trust stated that "[w]e effectively manage risk and avoid taking on additional risk. In the history of our program, we have *never experienced a loss* due to borrower default or insufficient collateral in a collateral pool". (italics in original); and that "none of our clients have ever sustained a loss as a result of our securities lending activities." *Id.* at A 127.

55.     Northern Trust further represented on page A126 that "[r]isk management is the cornerstone of our program. We take a qualitative and quantitative approach to measure and monitor risk each day, so that *you are protected from potential securities lending risks*." (emphasis added).

56.     In answer to the question—"what protection do you provide clients with respect to . . .market loss?"– Northern Trust represented that "*[t]he risk of collateral deficiencies is minimized* by our strict collateral requirements, daily mark-to-markets for both market and currency values, *and investment in quality money market instruments. Id.* at A131. (emphasis added).

57.     In the proposal at page A127 Northern Trust represented that its objectives in managing the "Custom Account" were to maintain the safety of principal:

> Our objectives in managing the fund are to maximize current income *to the extent that it is consistent with the safety of principal*, and to maintain liquidity and the agreed upon investment standards.  (emphasis added).

58.     Northern Trust also assured LACERS on other occasions that "Northern Trust's

1   securities lending program is a low risk investment activity."

2       59.     Northern Trust advertised its Securities Lending Program on its web site as

3   essentially a risk free way to earn income.  The web site claims: "Securities Lending provides an

4   opportunity to participate in Northern Trust's Global Securities Lending Program as a way to

5   enhance portfolio performance with a stringently managed risk . . . . Enhanced performance with

6   minimized risk."  See www.northerntrust.com, "Securities Lending".

7       60.     Northern Trust's web site, under "Securities Lending Market Intelligence, April

8   21, 2009" contains a reference and link ("Read More") with the following statement: "The

9   International Securities Lending Association (ISLA) published ['] Securities Lending: Your

10  Questions Answered ['] to provide beneficial owners with an independent overview of securities

11  lending, including information on risks and short selling."

12      61.     The ISLA publication contains this statement: "'While not risk-free, participation

13  in a well managed securities lending program is generally seen as a safe method of adding

14  incremental income to a portfolio without any significant impact on, or risk to, the overall

15  investment programme.'" [quoting Robert A. Dennis, CFA]

16      62.     Northern Trust has represented that its program provides "almost risk-free"

17  returns in its presentation to the City of Pontiac, Michigan's General Employees Retirement

18  System on October 29, 2008.

19      63.     PCA made a presentation to LACERS in July, 2010 entitled "Securities Lending

20  101," which stated on page three that "The securities lending collateral is typically invested in

21  money market fund like vehicles".

22      64.     A money market fund is a type of mutual fund that invests in low-risk securities.

23      65.     Northern Trust promised to invest the cash collateral in conservative, short-term,

24  highly liquid investments. Because the collateral received from securities borrowers was

25  borrowed money that had to be returned to the borrowers upon the return of those securities,

26  Northern Trust was required by contract to invest the cash collateral conservatively and prudently

27  in safe, liquid instruments that would maintain "safety of prinicpal."  Moreover, Northern Trust

28  was obligated to ensure that its investment decisions were made purely in the interests of

LACERS and did not sacrifice safety and liquidity in exchange for higher returns. Not only was it critical for Northern Trust to invest LACERS' cash collateral in safe, short-term instruments to guard against losses, but it was also critical to "maintain liquidity."

66.     In 1991, Northern Trust and LACERS entered into a written Securities Lending Services contract. That original Securities Lending Services contract was superceded when, on July 11, 2003, Northern Trust and LACERS entered into another written Securities Lending Services contract ("Securities Lending Agreement"), effective August 1, 2003 through July 31, 2006. The Securities Lending Agreement was modified by Amendment No.1, extending the effective date from August 1, 2006 through July 31, 2007. The Securities Lending Agreement was later modified by Amendment No. 2, extending the effective date from August 1, 2007 through July 31, 2008. The Securities Lending Agreement was modified a third time by Amendment No. 3, extending the effective date from August 1, 2008 through July 31, 2011. (A true and correct copy of the Securities Lending Agreement and Amendments 1, 2 and 3 are attached hereto and incorporated herein by reference as Exhibit "B".)

67.     Pursuant to the Securities Lending Agreement, Northern Trust had complete discretion to made investments. Northern Trust had the authority to loan LACERS' securities held by Northern Trust to third party borrowers. In exchange, LACERS received collateral from the borrower, typically cash, worth 102% of the value of any domestic security lent or 105% of the value of any foreign security lent. The cash collateral was then invested in investment accounts managed by Northern Trust including: (a) the Northern Trust Global Core Collateral Section account ("Global Core Collateral Section"); and (b) a Custom Cash Collateral Account, also known as the "Short Term Investment Account" ("Custom Account"). Northern Trust received fifteen percent (15%) of the securities lending revenue. (See Ex. B.)

68.     The Investment Objectives and Guidelines in Annex 1 to the Securities Lending Agreement ("Investment Objectives") govern the investment of collateral in the Custom Account. Pursuant to the Investment Objectives, Northern Trust agreed "to maximize current income" in a manner "consistent with the safety of principal" and "maintenance of liquidity". Similarly, according to the Investment Objectives for the Global Core Collateral Section and

Core Collateral Section, Northern Trust agreed to "maximize current income" in a manner "consistent with the preservation of capital and maintenance of liquidity by investing Cash Collateral of this section in accordance with the guidelines stated below. Cash Collateral investments emphasize liquidity and principal preservation as prime objectives." The Investment Guidelines include requirements for credit quality, maturity/liquidity and diversification. (See Collateral Schedules attached as Schedule B to Securities Lending Agreement attached hereto as Ex. B.)

69.     Pursuant to section 3.7 of the Securities Lending Agreement, Northern Trust is liable for any loss of Collateral or investment of cash Collateral (including loss of income or principal, or loss of market value thereof) "resulting from the negligence or intentional misconduct of [Northen Trust] in performing the duties allocated to it under this Agreement with respect to Collateral."

70.     In addition to its contractual obligations under the Securities Lending Agreement, Northern Trust had a duty to manage LACERS' assets in accordance with common law fiduciary standards. Northern Trust knowingly or recklessly breached its fiduciary and contractual duties by improperly investing LACERS' cash collateral in highly risky investments, in pursuit of higher fees.

E.     **As Early As 2004, Northern Trust Identified The Housing Bubble And Knew The Economic Risk It Posed To LACERS' Cash Collateral Investment In the Notes of Companies That Depended Upon Revenue From Mortgage Originations**

71.     Long before Northern Trust's securities lending program incurred the first losses, which were tied to the collapse of the housing bubble and the subprime mortgage market, Northern Trust knew that U.S. housing prices were highly inflated, that the inflation in the housing market was unsustainable, and that the bursting of the housing bubble would have severe consequences for investors.

72.     Specifically, Paul Kasriel, Senior Vice President and Director of Economic Research for Northern Trust, wrote extensively about the unsustainable inflation in the U.S. housing market, as early as 2004. A report he issued in June of 2004 compared the housing

Exhibit A Page 29

market to the stock market in 1999 immediately before it experienced a rapid decline in value. See Northern Trust Company, Economic Research Department, Positive Economic Activity, Paul Kasriel, *Housing: It's Different This Time (As It Was For Stocks in 1999)*.  See www.northerntrust.com.

73.     In July 2004, Mr. Kasriel described the housing market as "an economic accident waiting to happen." He warned that "the most serious collateral damage from a housing bust would be a wounded U.S. banking system" because "U.S. commercial banks have become major investors in mortgage-related debt."  He noted the historical correlation between a distressed banking industry and investor losses. *Id.* Paul Kasriel, *Collateral Damage From A U.S. Housing Bust*, July 30, 2004.

74.     On May 26, 2005 Mr. Kasriel warned that "the U.S. commercial banks' mortgage– related assets are now over 60% of their total assets– a postwar record high.  If the U.S. housing bubble were to go 'whoosh,' great damage would be done to the U.S. banking system.  Ask the Japanese how an economy performs for a decade when its banking system is crippled." *Regulatory Suasion– An Attempt At Deflating the Housing Bubble.*

75.     In the following years, Mr. Kasriel repeatedly warned that the collapse of the housing market was "likely to have a significant negative impact on the economy as a whole." *The Bell Tolls for Toll Bros.*, February 9, 2006, available at http://www.safehaven.com/print/4575/the-bell-tolls-for-toll-bros.

76.     On March 2, 2006 Mr. Kasriel again warned about the impending housing bubble in an article entitled, *Is Dave Leonhardt A Renter?* Mr. Leonhardt had written an article entitled, *Don't Fear the Bubble That Bursts.*  Mr. Kasriel disagreed with that premise, stating, <u>inter alia</u>:

> A lot of these adjustable-rate borrowers in the past two years are in the "sub-prime" category or are speculators. In either case, they probably have little equity in their homes. It has been estimated approximately $600 billion of sub-prime adjustable rate mortgages will reprice over the next two years. Chances are they will reprice at higher interest rates, not lower ones. *Chances are mortgage defaults will be on the rise with these repricings.* This will put "repos" on the market, which will depress home prices. Speculators, with

negative cash flows and slower or no appreciation in their investment properties, also will add to the glut of homes for sale.

(emphasis added).

77.    On August 25, 2006 Mr. Kasriel wrote an article entitled, *New Homes Market: Worst Supply-Demand Situation Since Early 1970s*, available at http://www.safehaven.com/articles. He wrote:

> *Downward pressure on existing home prices also could lead to increased mortgage defaults* as home-owners wanting to term out their adjustable rate mortgages may find the amount needed to be refinanced is more than the new lower appraised value of their home. Today H&R Block announced that it [is] setting aside $102.1 million as a result of *increasing mortgage delinquencies being experienced by its mortgage-originating subsidiaries. Folks, the bursting of one of the biggest U.S. housing market bubbles, if not the biggest [is] going to have a significant negative effect on the rest of the economy.*

(emphasis added)

78.    Mr. Kasriel wrote this article two days before August 28, 2006, when  Northern Trust made the disastrous decision to purchase $25,000,000 in notes of GreenPoint Mortgage Funding, Inc., the  mortgage-originating subsidiary of Capital One. The article was written six months before February 16, 2007, when Northern Trust made the disastrous decision to invest in the mortgage-originating business of Washington Mutual Bank. The article was written seven months before March 14, 2007, when Northern Trust made the disastrous decision to invest in notes tied to the mortgage-originating business of CIT Group. The article was written nine months before May 25, 2007, when Northern Trust made the disastrous decision to invest in notes tied to the mortgage-originating business of Lehman Brothers.

79.    Another economist from Northern Trust shared the same views as Mr. Kasriel.

80.    On September 26, 2006,  the Christian Science Monitor published an article entitled *How Long Will the Housing Slump Last?*, which quoted Dr. Asha Bangalore of Northern Trust.

81.    The article first summarized "[t]he expert consensus: the slump could last into the

summer of 2007. And the speed could depend on how many people hit the panic button or take their homes off the market". The article continued:

> "Additional price declines should not be surprising," says Asha Bangalore, an economist at Northern Trust Co. in Chicago. "We have a recession in the housing market.... Usually it takes two to three years to stabilize."

82.     The article then noted  that " [o]ne new uncertainty in this cycle is today's greater reliance on adjustable-rate mortgages. With the interest rates on those loans shifting upward, a key question is how many owners will have to unload homes they bought during good times when values were rising and interest rates were low."

83.     The article then quoted Dr. Bangalore on this subject:

> "The probability of a more disorderly correction is raised by this element," says Bangalore of Northern Trust.

84.     Mr. Kasriel was quoted in an article written by Chris Isidore for CNN Money, entitled *Subprime Woes: How Far, How Wide?*, dated March 5, 2007. The article quoted Mr. Kasriel as follows:

> "People who a year ago could have purchased a house with a subprime mortgage aren't going to be able to purchase", said Paul Kasriel, chief economist with Northern Trust in Chicago. "Increased foreclosures will mean more inventory on a market that already has a glut of homes for sale."

85.     The article also stated  that the subprime meltdown was <u>already underway</u>:

> "Kasriel said the additional hit to real estate from the subprime meltdown is likely to mean serious problems for the economy overall."

86.     The article noted  that the housing boom was *then* in reverse, according to Mr. Kasriel:

> "Housing has played a very large role in this expansion and one of the reasons it's played that role is there has been a change in the mortgage market," he [Kasriel] said. "This has been a credit-inducing housing boom that lifted other sectors of the economy and <u>it's all in reverse now</u>."

1  (emphasis added).

2  87.    On its website, under "Economist Biographies," Northern Trust proudly states that

3  Mr. Kasriel "identified early on the formation of the housing bubble and foresaw the economic

4  and financial market havoc that would ensue after the bubble inevitably burst."  At another part

5  of its website entitled "Securities Lending Market Intelligence, January 15, 2009," Northern

6  Trust states that Mr. Kasriel accurately predicted the "housing bubble."  The web site states:

7  "Who Saw the Housing Bubble Coming?  Northern Trust's Director of Economic Research, Paul

8  Kasriel, accurately predicted in 2004 the potentially disastrous effects of a collapse in the housing

9  market on financial institutions."

10  88.    Thus,  Northern Trust knew of the enormous, imprudent risks it was taking when

11  it invested the assets of LACERS in bonds or notes whose revenue was based  upon mortgage-

12  origination, or sub-prime mortgage loans, or the housing market itself. Northern Trust knew of

13  the warnings of its Chief Economist and thereby acted with knowledge or reckless disregard for

14  the Guidelines and their emphasis on principal preservation when investing in securities or bonds

15  dependent on the performance of the housing market.

16  **F.    Northern Trust Failed to Provide Reports on Securities Lending**

17  89.    Northern Trust has failed to deliver the services promised in the Proposal For

18  Master Trust/Custodial Services and Securities Lending dated October 10, 2006. That document

19  indicates on page A 105 that Northern Trust currently assesses LACERS $75,000 annually for

20  such services as "Executive Reporting": "We provide custom, executive-level board reporting

21  that highlights significant changes in your investment program, reasons for changes, items to

22  watch, and actions to consider".

23  90.    No such reports concerning securities lending were provided until the fall of 2008,

24  at the earliest.  In the first half of 2008 it took at least two months, if not longer, for LACERS

25  staff to obtain information about securities lending positions from Northern Trust which the staff

26  had to request, because the information had not been provided.

27  91.    The Proposal also states at page A 105  that Northern Trust Risk Services, as part

28  of the $75,000 fee, provides "executive-level reports that serve as periodic assessments of

1  expected market risks within your fund" and that "We provide this information to our clients

2  both on-line and in hard copy".  No such reports concerning securities lending were provided "in

3  hard copy" between 2006 (the date of the Greenpoint purchase) and June, 2008.  No "periodic

4  assessment of market risks" was provided to LACERS before June, 2008.

5  **G.      Northern Trust Failed to Monitor Transactions Comprising Nearly Half of Its Business**

6       92.      On June 2, 2011, the Financial Industry Regulatory Authority ("FINRA"), the

7  largest non-governmental regulator for securities firms doing business in the United States,

8  assessed a $600,000 fine against Northern Trust for Northern Trust's failure to adequately

9  monitor a substantial portion of its transactions.  *See* FINRA Letter of Acceptance, Waiver and

10  Consent No. 2009018771601,

11  http://disciplinaryactions.FINRA.org/viewdocument.aspx?DocNB=17114 ("FINRA Letter").

12       93.      As part of a settlement between FINRA and Northern Trust, "Northern Trust

13  accep[ed] and consent[ed], without admitting or denying the findings, . . . to the entry of the

14  following findings by the FINRA:"

15       •      From October 2006 to October 2009, Northern Trust used an exception reporting

16            system to monitor securities transactions and customer accounts for certain

17            conditions and events.  The exception reporting system would flag transactions or

18            accounts that met certain pre-determined parameters established by Northern

19            Trust, which would then be reviewed by Compliance personnel.  FINRA Letter at

20            3.

21       •      However, a substantial portion of Northern Trust's business escaped review:  "All

22            [mortgaged-backed securities] transactions, certain trades of 10,000 equity shares

23            or more, and certain trades of 250 or more fixed-income bonds ('large block

24            trades') were executed through a different system."  FINRA Letter at 3.

25       •      The unmonitored transactions comprised a substantial portion of Northern Trust's

26            business – 43.5% over a 19-month period.  FINRA Letter at 4.

27       •      As a result, "26 customer accounts held by individuals over the age of 70 held

28

1    cumulative [mortgage-backed-securities] positions in excess of 50% of the value

2    of their accounts" for the period January 2007 through June 2008. FINRA Letter

3    at 3.

4    •    Northern Trust did not update its exceptions reporting system until after FINRA

5    began an investigation.  FINRA Letter at 4.

6    •    In 1993, FINRA issued a Notice to Members which provided guidance about

7    member obligations when selling mortgage-backed securities.  Northern Trust,

8    therefore, "should have had a supervisory system in place to monitor the

9    suitability of [mortgage-backed security] transactions."  FINRA Letter at 4.

10   Likewise, Northern Trust also should have been aware of its "supervisory

11   responsibilities" based on a FINRA notice issued in 1999.  FINRA Letter at 4-5.

12   94.    In any event, the representations in the Proposal, such as the "continuous

13   monitoring of portfolio holdings, credit structures, and maturity profiles", Proposal at A131,

14   were false or misleading. The FINRA findings suggest  that there  was no monitoring  of large

15   block trades that  were apportioned  to the  LACERS  Custom Account.

16   **H.    Northern Trust Wrote Inadequate, Illusory Investment Guidelines Which
     Created The False Impression That The Investments Were "Low Risk"**

17   95.    Northern Trust prepared and drafted "Investment Manager Objectives and

18   Guidelines Short Term Investment Account" which provide that the stated purpose of LACERS'

19   Custom Account was "to maximize current income" in a manner "consistent with the safety of

20   principal, [and] maintenance of liquidity . . ."  Northern Trust's Objectives further provide that

21   "[T]he Cash Collateral fund of the Core Collateral Section seeks to maximize current income to

22   the extent consistent with the preservation of capital and maintenance of liquidity . . . [C]ash

23   Collateral investments *emphasize liquidity* and *principal preservation* as prime objectives."

24   See Exhibit B, Cash Collateral Funds, Investment Objectives (emphasis added).

25   96.    These guidelines created the false impression and false reassurance that Northern

26   Trust invested in "low risk" investments that preserved principal and liquidity.

27   97.    The Guidelines did nothing to prevent Northern Trust from making imprudent

28

Exhibit A Page 35

investments in the first place. As discussed more fully below, the investments alleged herein were imprudent on the day they were made because Northern Trust ignored many warnings that the housing bubble was an "economic accident waiting to happen" – as Northern Trust's Chief Economist warned before Northern Trust purchased the investments in question.

98.     The Guidelines provided for certain levels of "Credit Quality" at the time an investment was purchased, but provided no guidelines for the level of credit quality after the date of purchase.

99.     For example, the Guidelines provided that "[w]ith respect to bonds and other long-term obligations, investments and reinvestments shall be limited to obligations rated…at the time of purchase in one of the three highest rating categories …by at least two NSROSs [Nationally Recognized Statistical Rating Organizations]…"

100.    However, the Guidelines also state under "Trading Policy" that "[s]ubsequent to its purchase, a portfolio security or issuer thereof may be assigned a lower rating or cease to be rated. Such an event would not necessarily require the disposition of the security, if the continued holding of the security is determined to be in the best interest of the fund and the Participating Lenders of the Collateral Section".

101.    Thus, the Guidelines provided for a standard of "credit quality" only at the time of purchase, but not one moment thereafter. The Guidelines provided no specific provisions for measuring investments that had plummeted in value after the date of purchase and/or for disposing of investments that should be liquidated.

102.    The Guidelines for the Custom Account were so ambiguous and so general that they allowed Northern Trust to make imprudent investments.

103.    The Guidelines did not permit investments in "mortgage-backed securities," but did allow investments in "asset-backed securities."

104.    Northern Trust represented in 2008 that the investment in GreenPoint Mortgage Funding Trust (discussed below) was an "asset-backed" security and therefore did not violate the Guidelines.

105.    Later on, Northern Trust listed this investment as "mortgage backed ALT-A

RMBS" [an abbreviation for residential mortgage backed securities] in the Collateral Holdings Report of May 29, 2009 at p. 51.

106.    Northern Trust was therefore able to violate the Guidelines, by purchasing "mortgage-backed securities," and labeling them as "asset-backed securities."

107.    The investments became even more imprudent as the mortgage market collapsed in 2007 – as reflected by the collapse of the mortgage business of Lehman, Greenpoint, CIT Group and Washington Mutual in 2007, discussed more further below.

108.    Nevertheless, Northern Trust continued to hold these investments because of the inherent conflict of interest created by the perverse incentive of the "Heads we win, Tails you lose" investment strategy. Northern Trust benefitted while the investments produced interest income, even if the investments were certain to produce a loss to LACERS, since LACERS bore the loss but Northern Trust shared in the income, but not the loss.

109.    Under the Guidelines, Northern Trust could continue to hold an investment that had declined in value and cease to be rated if it was in the best interest of Northern Trust – but not necessarily in the best interests of LACERS.

110.    The Guidelines thus created, allowed, and promoted a conflict of interest between LACERS and Northern Trust and other pension funds who were Participating Lenders in the commingled pools.

111.    The Guidelines created, allowed, and promoted the conflict of interest that occurred when Northern Trust made decisions in the best interest of itself  -  but not for LACERS individually.

112.    The Guidelines permitted and encouraged Northern Trust to hold on to investments for as long as Northern Trust decided to, regardless of the fact that the ratings for these investments plummeted or that  the investments decreased in value. That is exactly what Northern Trust did here, as explained more fully below.

113.    The Guidelines provided only the illusion of protection and did not ensure or implement the Investment Objectives of "liquidity" and " principal preservation."

I.   **Northern Trust Invested in Notes Tied to the Mortgage-Origination Business Without Disclosing the Huge Risks Identified By Its Chief Economist**

114.    The risks that Mr. Kasriel warned of—that the housing collapse would bring down the economy and, in particular, banks like Washington Mutual that had invested heavily in mortgages – were realized in 2007. For example, in February 2007, HSBC– one of the world's largest banks – wrote down the value of mortgage-backed securities it held by $10.5 billion, reflecting the significant decline in the value of such asset-backed investments.

115.    In February, 2007 the Federal Home Loan Mortgage Corporation ("Freddie Mac") announced that it would no longer buy the most risky subprime mortgages and mortgage-related securities.

116.    Just weeks later, the nation's second largest U.S. subprime mortgage lender, New Century Financial Corporation, collapsed and filed for bankruptcy.

117.    This collapse was the first in a series of major mortgage lenders that failed in the following months, with roughly 100 mortgage lenders failing by the end of the year.

118.    The subprime crisis was already prominent in the news and had expanded to the risks associated with Alt-A mortgages by early 2007. See Gretchen Morgenson, *Will Other Mortgage Dominoes Fall?*, N.Y. Times, Feb. 19, 2007 (discussing strain in the Alt-A sector of the CDO market); Chris Isidore, "'Liar Loans' Mortgage Woes Beyond Subprime," CNNMoney.com, Mar.19, 2007 (describing how growth of Alt-A mortgage loans had surpassed subprime loans and underpinned much of the real estate boom in 2004 and 2005).

119.    Indeed, the "subprime meltdown" had already occurred by March 5, 2007, when Mr. Isidore wrote *Subprime Woes: How Far, How Wide?* in CNNMoney and quoted Paul Kasriel on that very point, when he noted that the "housing boom" was already in reverse and that the subprime meltdown was already underway.

120.    It should have been clear to Northern Trust by mid-2007 that the subprime mortgage collapse implicated a broad array of LACERS' cash collateral investments

121.    In June, 2007 Standard and Poor and Moody's Investor Services downgraded over 100 bonds backed by second-lien subprime mortgages.

122.   In June 2007, two multi-billion dollar hedge funds managed by Bear Stearns, one of the largest investment banks in the United States, collapsed due to losses tied to subprime mortgages, leading Bear Stearns to file for bankruptcy in July, 2007.

123.   On July 25, 2007, the New York Times published an article entitled, *Top Lender Sees Mortgage Woes For 'Good' Risks*. The article stated that "Countrywide Financial, the nation's largest mortgage lender, said yesterday that more borrowers with good credit were falling behind on their loans and that the housing market might not begin recovering until 2009 because of a decline in housing prices that goes beyond anything experienced in decades". The article noted that "Countrywide's stark assessment signaled a critical change in the substance and tenor of how housing executives are publicly describing the market." The article continued: "Bond rating agencies have begun to downgrade and re-evaluate mortgage securities, which has virtually shut down the market for certain debt offerings that specialize in home loans."

124.   By August 2007, numerous investment funds—including those managed by major banks, such as French bank BNP Paribas—reported significant losses as a result of the subprime collapse, and the resultant lessening of liquidity in the markets as investors steered away from asset-backed securities.

125.   In August, 2007 American Home Mortgage, the tenth largest retail mortgage lender in the United States, filed for bankruptcy protection.

126.   In August, 2007, Capital One announced that it was closing down GreenPoint Mortgage Funding and its mortgage lending business.

127.   On August 13, 2007, Mr. Kasriel commented on the housing bubble in an article entitled *Wall Street and Main Street Are Joined At the Hip*, available at www.northerntrust.com. The article states: "Now that . . .risk aversion toward mortgage-related securities has increased, the effective cost of mortgage credit has increased.  This will mean that contraction in home sales will persist. . .fewer homeowners will qualify to refinance their mortgage. . .So the tremors on Wall Street related to the mortgage markets will be felt on Main Street."

128.   On August 15, 2007 Countrywide Financial, the largest mortgage lender in the United States, stated that foreclosures and mortgage delinquencies had risen to the highest levels

since 2002.

129.    On August 23, 2007, Lehman Brothers announced that it was shutting down its mortgage unit and laying off 1,200 employees.

130.    At the end of September 2007, Swiss banking giant UBS disclosed a quarterly loss of almost $700 million and that it must write down $3.4 billion from subprime mortgage related investments.

131.    In October 2007, Merrill Lynch's CEO Stanley O'Neal resigned  soon after Merrill Lynch revealed  approximately $8 billion in exposure to bad debt.

132.    On November 28, 2007 Fitch Ratings issued a "Special Report" entitled *The Impact of Poor Underwriting Practices and Fraud in Subprime TMBS Performance*. The Report noted that "products such as 'no money down' and 'stated income' mortgages appear to have become vehicles for misrepresentation or fraud throughout the loan origination process."

133.    In January 2008, a major bond insurer, MBIA, announced a loss of $2.3 billion, blaming its exposure on the subprime mortgage crisis.

134.    In March 2008, Bear Stearns announced liquidity problems and was purchased by JP Morgan Chase for $2 per share. The collapse and sale of one of the most prominent institutions on Wall Street sparked fears about the financial sector.

135.    In April 2008, UBS acknowledged the need for $37 billion write-downs and its CEO, Marcel Ospel, resigned.

136.    In April 2008, the Royal Bank of Scotland announced a write-down of approximately $ 9 billion, primarily attributable to losses in the credit market and mortgage-backed securities.

137.    In July 2008, the FDIC seized Indy Mac Bancorp., Inc., one of the largest savings and loan companies in the country, whose prolific mortgage activities led to its demise.

138.    In September 2008, the government announced the seizure of federal mortgage insurers Federal National Mortgage Association and Freddie Mac, firms that were crippled by mortgage defaults.

139.    These events – demonstrating the collapse of the mortgage market in early 2007,

1   coupled with the continued warnings of its own economists before and after 2007–should have

2   led Northern Trust to avoid investments tied to mortgage loans, or to liquidate investments tied

3   to mortgage loans.

4   **J.   Northern Trust Kept LACERS in the Dark About Risky Investments that Northern Trust Made for LACERS**

5   140.   In the face of Northern Trust's knowledge that investing in securities tied to the

6   mortgage industry was going to be disastrous, Northern Trust decided to plunge full-steam ahead,

7   right into the impending collapse of the housing market that Chief Economist Kasriel predicted.

8   141.   Northern Trust failed to inform LACERS that Northern Trust had changed course,

9   from making "low risk" investments to making high risk investments.

10   142.   During the period from June 26, 2006 (the date of Northern Trust's promise of

11   "low risk" investment) until June, 2008, Northern Trust provided no details of each specific

12   investment in the securities lending portfolio, such as the current market value of each specific

13   investment.

14   143.   Northern Trust did not provide monthly statements to LACERS.

15   144.   Northern Trust did not discuss its investments in Washington Mutual Bank, CIT

16   Group, Lehman Brothers or Greenpoint Mortgage Funding with LACERS before June, 2008.

17   145.   Northern Trust did not provide LACERS with reports which listed specific

18   holdings of securities in its Custom Account, and the market value of those specific holdings,

19   before June, 2008.

20   **K.   Northern Trust Misrepresented That The Investment in GreenPoint**
21   **Mortgage Funding Trust Was "Low Risk," Knowing That it Was A Very High Risk Investment**

22   146.   On or about August 28, 2006, Northern Trust purchased $25,000,000 in a floating

23   rate bond issued by GreenPoint Mortgage Funding Trust, with a maturity date of March 12, 2037,

24   on behalf of LACERS' direct holdings in its Custom Account. Over time, the investment

25   increased in risk and became even more unsuitable for LACERS.

26   147.   By making this investment in the Securities Lending Program, Northern Trust

27   represented that the investment was "low risk."

28   148.   Northern Trust knew that the investment involved a high risk, but failed to inform

LACERS of the fact.

149.    Northern Trust failed to disclose to LACERS that it was making a high risk investment in the mortgage business and failed to disclose to LACERS the risks involved in such an investment.

150.    By this time GreenPoint had established itself as the seventh largest mortgage origination company in the United States, with a reputation and business model built on "no documentation loans".

151.    According to the Mortgage Info web site from 2006, www.mortgage-info.us, "Greenpoint is a leading national lender in residential mortgages, specializing in no-documentation and 'Alternative A' mortgage loans...the True NoDoc option is available in most states. For this there is no income disclosure (NID), no asset verification (NAV), and no employment disclosure (NED)."

152.    One such loan was issued to Ms. Nessia Jones on October 30, 2006.  Because of its date, this loan was probably securitized as part of the Greenpoint Notes discussed herein.

153.    GreenPoint Mortgage Funding issued a first mortgage to Ms. Jones in the sum of $120,700 with an interest rate of 8.65% and a second mortgage, home equity loan, in the sum of $30,100, bearing interest at prime plus 5 basis points, or $13.25%. The monthly payments were $938.79 of principal and interest on the first mortgage and $327.80 (interest only) on the home equity loan. Ms. Jones obtained a "no documentation" loan.  Her total monthly income from all sources was $633.00, consisting of a widow's social security benefits, which were used to support herself and her disabled daughter.  The total amount due each month was $1266.59 -- 200% of her monthly income.  The loans were apparently based solely upon the appraised value of the house – $150,900, making the amount of the loans ($150,700) almost equal to the appraised value of the house.  See letter of April 8, 2008 from the Legal Aid Society of Georgia to the Board of Governors of the Federal Reserve System, available at www.federalreserve.gov/SERC/2008/May/...R-1305_2273_1.pdf.

154.    As with other investments in the Custom Account, Northern Trust made the purchase of GreenPoint without disclosing in advance, or afterward, its investment strategy.

Northern Trust had complete discretion to purchase securities for LACERS, as part of the Securities Lending Agreement. Northern Trust did not disclose its investment strategy for this particular investment or for the Custom Account as a whole, other than to indicate that investments in the securities lending portfolio were "low risk.".

155.   Northern Trust did not disclose to LACERS the risk of this investment or the repeated warnings of its Chief Economist about the housing bubble. Nor did Northern Trust inform LACERS that it was purchasing this investment for LACERS, before the purchase was made.

156.   No one at Northern Trust charged with making investments for LACERS read the prospectus before making the investment for LACERS.

157.   The Prospectus Supplement for the GreenPoint Mortgage Funding Trust 2006-HE1 is dated August 25, 2006. Northern Trust made the purchase for LACERS (and other pension funds) on August 28, 2006. The Prospectus contains 490 or more pages and tables. It would take any person many hours, or even days or weeks, to read, comprehend, and analyze the risks of this investment.

158.   The Prospectus indicates that Lehman Brothers Holdings Inc., the sponsor, has used a wholly owned subsidiary, Structured Asset Securities Corporation, the depositor, to establish the GreenPoint Mortgage Funding Trust 2006-HE 1, the issuing entity. With the money raised from the sale of notes, the Trust will acquire a pool of adjustable rate, one-to-four family residential first lien and second lien revolving home equity lines of credit and certain fixed rate, closed end, second lien mortgage loans. Prospectus ("P") at 1.

159.   The number of loans is 29,915 – 28,085 home equity lines of credit ("HELOCs") and 1,830 closed end, second lien mortgage loans. P at S-2.

160.   The Risk Factors identified in the Prospectus include the following:

    a.   Increased Risk of Loss as a Result of 10 year Amortization Period for Substantially all of the HELOCs. "The home equity lines of credit require no principal payments or minimal principal during the first 5 10 or 15 years following origination, and substantially all of the home equity lines

of credit require repayment of the principal amount outstanding at the commencement of the repayment period over the remaining term in equal monthly installments. <u>Home equity lines of credit with terms like those pose a special payment risk because the borrower must start making substantially higher payments at the start of the repayment period."</u>
P at S-15 (emphasis added).

b.    Lack of Suitability. "The securities may not be a suitable investment if you require a regular or predictable schedule of payment, or payment on any specific date. Because the mortgage loans in the trust fund may include a substantial proportion of loans as to which the borrowers have <u>blemished credit histories</u> (including prior bankruptcy proceedings) or loans whose future performance is difficult to predict, such as adjustable payment mortgage loans, interest-only loans, and other factors relating to the mortgage loans discussed above,  the yields and the aggregate amount and timing of distributions on your securities may be subject to substantial variability from period to period over the lives of the securities. <u>An investment in these types of securities involves significant risks and uncertainties and should only be considered by sophisticated investors, who, either alone or with financial, tax and legal advisors, have carefully analyzed the mortgages and the securities and understand the risks</u>". *Id.* at 35 (emphasis added).

c.    "Risks Related to Higher Expected Loan Delinquencies of the Loans. The loans. . . were originated according to underwriting guidelines that are not as strict as Fannie Mae of Freddie Mac guidelines. . . In particular, a significant portion of the loans in the trust fund were classified as relatively low (i.e., relatively higher risk) credit categories." P at S-16.

d.    Lack of Statistical Data. "Several types of  adjustable mortgage loans discussed above, in particular 'option ARMS' and interest-only mortgage

loans, have only been originated in any significant numbers in relatively recent years. Consequently, there is no material statistical information showing payment and default trends under a variety of macroeconomic conditions. In particular, it is unclear how these mortgage loan products will perform in a declining housing market or under negative macroeconomic conditions". *Id.* at 12. (emphasis added).

Northern Trust did not know any specific details pertaining to any one of the 29, 915 loans, such as the name of the loan applicant, the address of the residence, the income of the loan applicant, the amount of the loan, or the appraised value of the particular residence. Northern Trust was making a "blind" investment.

e.   No documentation or limited documentation loans. The loans were originated by GreenPoint Mortgage Funding, Inc., which either originates the loans or obtains the loans from others (whose identities are not specified). GreenPoint acquires or originates "many mortgages under 'limited documentation' or 'no documentation' programs". P at S-39.

f.   Under the "no documentation" loans, "no information was obtained regarding the borrower's income or employment and there was no verification of the borrower's assets". P at S-41.

g.   Risks Related to Negative Amortization. Approximately 28% of the second lien loans are secured by unrelated senior loans that include a negative amortization feature. "Negative amortization may result in increased delinquencies and defaults on mortgage loans, which may result in payment delays and losses on loans secured by the mortgaged property". P at S-16.

h.   "Special Default Risk of Second Lien Mortgages. Approximately 98.6 % of [the] loan pool consists of second lien mortgage loans that are secured by second liens on the related mortgaged properties. These second lien

mortgage loans are subordinate to the rights of the mortgager under the related first lien mortgage loan and may present special risks upon default of any second lien mortgages". P at S-18.

i.   Interest-Only Cash Flow in Early Years of Loans. "Approximately 82.5% … of the loans provide for payment of interest …but no payment of principal, for a period of 5-years, 10-years and 15 years…As a result there may be limited collections available to make payments to you and you may receive payments of principal more slowly than anticipated." P at S-11.

j.   Difference in interest rates. "Interest payable on the loans may be insufficient to pay interest on the offered notes". The home equity loans are subject to variable interest rates that differ from the interest due under the notes to investors. P at S-12.

k.   Risks From Adjustable Rate Loans. "As the fixed interest on hybrid mortgage loans expire and convert to adjustable rates, borrowers may find that the new minimum monthly payments are considerably higher and they may not be able to make those payments. In addition, without regard to changes in interest rates, the monthly payments on mortgages with interest-only negative amortization features will increase substantially when the principal must be paid. All of these factors, or a combination of these factors, could cause mortgage loan defaults to increase substantially."   August 11, 2006 Prospectus at 10.

l.   Housing Prices Bubble: "if the rapid increase in housing prices ceases or housing prices decline, borrowers who intend to sell their properties on or before the expiration of the fixed rate periods or interest-only periods may find that they cannot sell their properties for an amount equal to or greater than the unpaid principal balance of their loans, especially in the case of negative amortization mortgage loans. These events could cause borrowers to default on their mortgage loans." *Id.* at 10-11. This is the exact scenario

1     that Chief Economist Paul Kasriel warned against.

2       m.   Existing Mortgage Defaults May Be Included in the Loan Pool. "As

3     specified in the related prospectus supplement, a certain number of

4     mortgage loans included in the trust fund may be delinquent as of the

5     applicable cut-off date or may have been delinquent in payment in the last

6     twelve months on one or more due dates". *Id.* at 14.

7       n.   Loan-to- Value Ratios May Exceed 100%. "As specified in the related

8     prospectus supplement, some of the mortgage loans in the trust fund may

9     have original loan-to-value ratios greater than 80%. Mortgage loans with

10    high loan-to-value loans, <u>particularly those in excess of 100%</u>, may be

11    more likely to experience default and foreclosure than loans with low

12    original loan-to-value ratios". *Id.* at 14. (emphasis added). Furthermore,

13    "[t]he general underwriting guidelines permit two to four family loans to

14    have loan to value ratios at origination of generally up to 90% (or, in

15    certain cases, 100%.)". P at S-41.

16      o.   Geographic Concentration Risk. 54.19% of the loans were secured by

17    mortgaged properties in California. "Such concentrations may result in

18    greater losses to noteholders than those generally present for similar notes

19    without such concentration." P at S-10.

20      p.   Proceeds Used to Repay Loans Which Are Part of the Pool. "Immediately

21    prior to the transfer of the Loans to the Indenture Trustee, certain of the

22    Loans were subject to financing provided by an affiliate of Lehman

23    Brothers Inc. The Depositor will apply a portion of the proceeds from the

24    sale of the Notes to repay the financing." P at S-76. This statement

25    suggests that there is a revolving door – the money raised from the sale of

26    the Notes is used to pay the amounts due on delinquent loans issued by an

27    affiliate of Lehman – the very loans which are part of the pool. Thus, the

28    purchasers of the Notes appear to have the proceeds of their investment

used to re-pay the loans that will, in turn,  then generate interest to be re-paid to the noteholders. In effect, the noteholders are investing their own money in order  to pay it back to themselves.

q.   Significant Numbers of Loans May Represent Underwriting Exception. "The general underwriting guidelines used by originators other [than] GreenPoint are generally intended to evaluate the credit risk of loans made to borrowers with imperfect credit histories, ranging from minor delinquencies to bankruptcy, or borrowers with relatively high ratios of monthly mortgage payments to income or relatively high ratios of total monthly credit payments to income.  On a case by case basis, the originators may determine that " a prospective mortgagor. . . warrants an underwriting exception. . .a significant number of loans may represent such underwriting exceptions."  P at S-40.

r.   Lack of Information As To Identity of Mortgage Originators and Their Credit Guidelines.  "The Loans were originated on the basis of loan application packages submitted through mortgage companies or at the related originator's retail branches or were purchased from originators approved by the originators."  P at S-40.  The Prospectus does not indicate the names of these mortgage origination companies or the number of loans from each of the different mortgage originator companies, making it impossible to determine what the actual underwriting guidelines were.

161.   Northern Trust knew that these risks made the investment a very high risk investment that was imprudent, in violation of the Securities Lending Program, and contrary to Northern Trust's representation to invest only in "low risk" investments that were "almost risk free."

162.   The risks identified in the Prospectus were the very risks that Chief Economist Kasriel had noted in his article of May 26, 2005, *Regulatory Suasion, supra*, a year before Northern Trust made the investment in GreenPoint, in which Mr. Kasriel wrote:

Exhibit A Page 48

"These risky elements [in home equity lending] identified by the regulators are:

. Interest only features that require no amortization of principal for a protracted period;

. Limited or no documentation of a borrower's assets, employment and income;

. Higher loan-to-value (LTV) and debt-to-income ratios."

163.    As the value of the GreenPoint Notes continued to plummet with attendant downgrades published by the rating organizations, Northern Trust decided to hold the investment, rather than sell it to mitigate losses. This was the same stance that Northern Trust took across the board, for virtually all "unrealized" losses that were increasing in the LACERS portfolio. The "stand pat" position once again favored Northern Trust at the expense of LACERS. If the investment rebounded, Northern Trust stood to profit. If the value of the GreenPoint notes continued to sink, as it did, then Northern Trust had nothing to lose.

164.    The "stand pat" position also disregarded the continued warnings of Chief Economist Kasriel. By March 5, 2007 he wrote that the "subprime meltdown" was already underway. The "stand pat" position also disregarded the news that investments in mortgage-backed securities led to the collapse of Bear Stearns hedge funds in July, 2007. The "stand pat" position also disregarded the news that GreenPoint Mortgage Funding closed its business entirely in August, 2007; that Lehman Brothers closed its mortgage unit in August, 2007; and that banks such as Countrywide, BNP Paribas and UBS were announcing huge losses from subprime mortgages during this period. The "stand pat" position also disregarded the downgrades by Moody's and Standard & Poor's. Downgrades started on December 14, 2007 and continued to get worse and worse thereafter.

165.    On information and belief, Northern Trust never did analyze the particular mortgage loans in question and was incapable of doing so, since the Prospectus did not provide,

and Northern Trust lacked, the necessary statistical information to determine the likelihood that the homeowners in question would default on their mortgages. This lack of information is yet another reason why it was highly risky and imprudent for Northern Trust to make the investment in question.

166.    Northern Trust continued to hold this investment during the mortgage industry meltdown and even after GreenPoint closed its mortgage business.

167.    The very fact that GreenPoint issued "no documentation" loans was reason enough – without anything else – that Northern Trust should never have purchased the GreenPoint Notes for LACERS.

168.    Just as Northern Trust failed to read the GreenPoint prospectus and failed to heed the writings of its Chief Economist, Paul Kasriel, Northern Trust failed to heed the warnings of the rating organizations.

169.    On April 5, 2007 Standard and Poor's "weighed in" on "no documentation" loans, finding that these loans resulted in a pattern of defaults within four months of the loan origination. See S. Barnes, et al, *Standard and Poor's Weighs In On The U.S. Subprime Mortgage Market*, reprinted at www2.standardandpoors.com/spf/...subprime_measuring_042707.

170.    On August 20, 2007 Bloomberg reported that "Capital One Financial Corp. shut its GreenPoint Mortgage unit, eliminating 1,900 jobs, and lowered its earning forecasts as the worst U.S.-housing slump in 16 years erodes demand for home loans...The real estate market nationwide has contracted and investors have shunned mortgage-backed securities since defaults on loans to homebuyers with poor credit rose to a record earlier this year. More than 90 mortgage companies have closed operations or sought buyers since the start of 2006, according to Bloomberg data...Investors who buy Alt-A loans stopped bidding this year as concern about rising defaults grew, pushing lenders including American Home Mortgage Investment Corp. and HomeBanc Corp. into bankruptcy this month....GreenPoint was a 'wholesale' unit that provided loans through outside firms, rather than to individual borrowers. Regulators have criticized loans made by brokers nationwide, saying they were interested in generating upfront fees and didn't pay enough attention to whether borrowers qualified." Joseph DiStefano, *Capital One Closes*

1   *GreenPoint Mortgage*, available at www. Bloomberg.com/apps/news?pid=newsarchive.

2     171.   Reporting on the closing of GreenPoint's headquarters in Novato, CA, the *Marin*

3 *Independent Journal* noted on August 20, 2007: "As the nation's housing market has cooled, the

4 mortgage industry has struggled with a dramatic rise in mortgage defaults and forclosures. Many

5 homebuyers have been forced into default or foreclosure because they haven't been able to sell

6 their homes or end up owing more money than their home is worth".

7     172.   Between December 2007 and February 2009, Moodys and Standard & Poor's

8 downgraded GreenPoint's securities on several occasions:

9 Moody's

| Date | Rating |
|---|---|
| 12/14/07 - downgrade | Aaa- |
| 02/07/08 - downgrade | A3 |
| 12/05/08 - downgrade | Caa1 |
| 03/09/09 - downgrade | Ca |

Standard & Poor's

| Date | Rating |
|---|---|
| 02/04/08 - downgrade | AAA- |
| 02/26/08 - downgrade | A- |
| 06/10/08 - downgrade | BBB- |
| 11/19/08 - downgrade | B |
| 02/11/09 - upgrade | BB |
| 02/18/09 - downgrade | CC |

    173.   Northern Trust disregarded the warnings of the Federal Reserve about riskiness of Alt A loans. The Federal Reserve Board's Finance and Economics Discussion Series, concluded that Alt-A mortgages are more risky than subprime mortgages under certain circumstances:

    "On other observable risk dimensions, Alt-A mortgage pools appear riskier

    than subprime pools. For example, investors are considered more likely to

    default on mortgages than owner-occupants, and about 25 percent of Alt-A

    mortgages were originated on investment properties, compared with

about 10 percent of subprime mortgages. In addition, around 70 percent of loans in Alt-A pools did not include full documentation of income, assets, or both (so-called low- or no-documentation loans), compared with 35 percent of loans in subprime pools.

*************

For Alt-A loans, instead of changing the assumed period of time over which borrowers repay the balance, lenders often dropped the requirement that borrowers payoff any principal at all in the early years of the mortgage. Forty percent of Alt-A mortgages involved only interest payments without any scheduled principal repayment (only about 10 percent of subprime mortgages have such an interest-only feature). Even more strikingly, another 20 percent of Alt-A mortgages allowed the mortgage balance to increase over time (so-called "negative amortization")." Christopher J. Mayer, Karen M. Pence, and Shane M. Sherlund, *The Rise in Mortgage Defaults*, Finance and Economics Discussion Series, Divisions of Research & Statistics and Monetary Affairs, Federal Reserve Board, available at www.federalreserve.gov/Pubs/feds/2008/200859.

174.    On or about July 28, 2008, Standard & Poor's *Projected Losses For 2005-2007 Vintage U.S. HELOC RMBS Transactions* projected a loss of 31.98% for the GreenPoint notes.

175.    Despite the many warning signs concerning the substantial troubles within the mortgage industry, despite the downgrades, despite the closing of GreenPoint's mortgage business, Northern Trust failed to protect LACERS, and continued to hold the GreenPoint notes.

176.    By making the foregoing investments and failing to take action in the face of the warnings and continued downgrades of the investment, Northern Trust acted with knowing or reckless disregard for its representations to make "low risk" investments.

177.    Northern Trust knowingly misrepresented to LACERS the nature of the GreenPoint investment on October 13, 2008, to assure LACERS that the investment was sound and adequately secured. Northern Trust stated that "Greenpoint Mortgage Funding's collateral

pool consists of Alt -A <u>first lien</u> residential mortgages." (emphasis added)

178.    Northern Trust knew that this statement was false or made the statement with reckless disregard for the truth. As noted above, the GreenPoint Prospectus states at S-18 that "[a]pproximately 98.6% of [the] loan pool consists of <u>second lien</u> mortages that are secured by <u>second liens</u> on the related mortgaged properties. These <u>second lien</u> mortgage loans are subordinate to the rights of the mortgagee under the related first lien mortgage loans and may present special risks upon default of any <u>second lien</u> mortgage loans". (emphasis added)

179.    Northern Trust knew the difference between first lien mortages and second lien mortages when it made the statement in question.

**L.    Northern Trust Misrepresented That The Investment in Washington Mutual Bonds Was A "Low Risk," Knowing That It Was A Very High Risk Investment**

180.    On or about February 16, 2007, Northern Trust purchased $31,625,000 in bonds issued by Washington Mutual, with a maturity date of May 1, 2009, on behalf of LACERS' direct holdings in its Custom Account.  On or about March 12, 2007, Northern Trust purchased an additional $50,000,000 in bonds issued by Washington Mutual Bank, also with a maturity date of May 1, 2009, on behalf of LACERS' direct holdings in its Custom Account.

181.    By making the investment in the Securities Lending Program, Northern Trust represented that the investment was "low risk."  Northern Trust knew that the investment involved a high risk, but failed to inform LACERS of this fact.

182.    The Prospectus, dated September 8, 2006, identified numerous "Risk Factors", including the following at page 6: *"Rising interest rates, unemployment and decreases in housing prices impact credit performance"* (emphasis in original). " If unemployment were to rise and either a slowdown in housing price appreciation or outright declines in housing prioces were to occur, borrowers might have difficulty repaying their loans. As a result the Issuer could experience higher credit losses in its mortgage and home equity portfolios, which could adversely affect its earnings."

183.    The Prospectus also warned against the *"Risks related to the option adjustable-rate mortgage product." Id.* (emphasis in original). This product involved negative amortization

loans. The Prospectus stated that "[t]he Issuer ...assesses the adequacy of its loan allowance loss in light of prevailing circumstances and the historical and current levels of negative amortization in its Option ARM portfolio. If credit risks associated with Option ARM were to increase in severity, the Issuer's earnings could be adversely affected".

184.    The Prospectus also warned against "*Risks related to subprime lending.*"*Id.* at 7 (emphasis in original). "The Issuer remains committed to the subprime mortgage market and intends to increase the loan volume of its subprime mortgage division, Long Beach Mortgage, and to maintain the size of its purchased home loan portfolio...If unemployment were to rise or either a slowdown in housing price appreciation or outright declines in housing prices were to occur, subprime borrowers, who tend to have greater vulnerability to such changes than prime borrowers, may be unable to repay their loans and the credit performance of the Issuer's subprime portfolios could suffer, with a potential adverse effect on earnings." *Id.*

185.    The Prospectus also warned against "*potential overextension of housing prices in certain geographical markets." Id.* at 8 (emphasis in original). "A prolonged economic downturn could increase the number of customers who become delinquent or default on their loans, or a rising interest environment could increase the negative amortization of Option ARM loans, which may eventually result in increased delinquencies and defaults. Rising interest rates could also decrease customer demand for loans.  An increase in delinquencies or defaults could result in a higher level of charge-offs and provision for loan and lease losses, which could adversely affect earnings." *Id.*

186.    The Prospectus also warned against the risks associated with the "secondary market". *Id.* at 12. "Notes may have no established trading market when issued, and one may never develop. If a market does develop, it will not be very liquid. Therefore, investors may not be able to sell their Notes easily or at prices that will provide them with a yield comparable to similar investments that have developed a secondary market...Illiquidity may have a severe adverse effect on the market value of Notes." *Id.*

187.    Northern Trust ignored these warnings, ignored the warnings of its Chief Economist, ignored the warnings of Dr. Asha Bangalore, and purchased the Notes. This

investment was not suitable for the pension fund and was not suitable to accomplish the objectives set forth in the Guidelines of preserving capital and maintaining liquidity.

188.   Soon thereafter, the value of the Notes declined dramatically.

189.   The three major credit ratings agencies continued to downgrade Washington Mutual securities, following the date of Northern Trust's purchase of these securities in February and March 2007.

Fitch

| Date | Rating |
|------|--------|
| 12/10/07 - downgrade | A- |
| 03/07/08 - downgrade | BBB |
| 09/18/08 - downgrade | BBB |
| 09/24/08 - downgrade | B |
| 09/26/08 - downgrade | C |
| 10/06/08 - downgrade | D |
| 11/10/08 | WD – rating withdrawn |

Moody's

| Date | Rating |
|------|--------|
| 11/09/07 - downgrade | A2 |
| 12/10/07 - downgrade | Baa1 |
| 03/14/08 - downgrade | Baa2 |
| 09/11/08 - downgrade | Baa3 |
| 09/26/08 - downgrade | Ca |
| 12/09/08 - downgrade | C |
| 12/15/08 | WR – rating withdrawn |

Standard & Poor's

| Date | Rating |
|------|--------|
| 01/18/08 - downgrade | A- |
| 03/06/08 - downgrade | BBB+ |
| 07/23/08 - downgrade | BBB |

| 09/15/08 - downgrade | BBB- |
| 09/26/08 - downgrade | D |
| 02/20/09 - downgrade | D |
| 11/10/09 | NR – rating withdrawn |

190.   Numerous additional warning signs concerning the imprudence of the issued securities as a viable investment were glaring.  For example, in early 2007, Washington Mutual revealed that its residential mortgage division lost approximately $48 million in 2006, compared with a net income of approximately $1 billion in 2005, due in large part to the company's heavy involvement in the subprime and Alt-A mortgage industry.

191.   Washington Mutual had continuing financial risk, holding billions of dollars in subprime mortgages, stemming from its 1999 purchase of Long Beach Mortgage Company, one of the nation's largest subprime lenders.

192.   Washington Mutual had continuing financial risk stemming from a loan product it marketed called the Option  ARM, which resulted in "negative amortization".

193.   On October 8, 2007, Northern Trust's Fixed Income Research department "commented" on the financial environment and its effect on Washington Mutual, Inc. and changed its internal rating outlook on Washington Mutual, Inc.

194.   On December 10, 2007, Washington Mutual Inc. announced that it expected to increase its loan loss provision in the fourth quarter up to $1.6 billion, up from previous guidance of $1.3 billion.

195.   On December 10, 2007, Fitch downgraded Washington Mutual Inc.'s rating to A- from A, based on its expectation that Washington Mutual Inc. would suffer substantial deterioration in its residential mortgage portfolio.

196.   Also based on its expectation that Washington Mutual Inc. would suffer substantial deterioration in its residential mortgage portfolio, Moody's downgraded its rating on Washington Mutual Inc. two notches, to Baa2 – only two notches above junk status.

197.   On January 18, 2008, Northern Trust's Fixed Income Research department commented on the Standard & Poor's ratings downgrade on that date.

198.   On March 6, 2008, Standard & Poor's issued additional downgrades for Washington Mutual Inc. and Washington Mutual Bank, stating:

> "These rating actions reflect our expectations for a more severe residential mortgage credit cycle than we had anticipated at the start of 2008. We now believe that the severity of losses on all residential mortgages will be higher that we had thought and that the weak housing market will now be a longer cycle."  See "S&P Downgrades Washington Mutual, Places on Negative Watch," MarketWatch.com (March 6, 2008) (citing Standard & Poor's credit analyst Victoria Wagner).

199.   On March 6, 2008, Northern Trust's Fixed Income Research division commented on Standard & Poor's downgrades but failed to take any action to protect LACERS' cash collateral investments.

200.   On March 14, 2008, Moody's downgraded its rating on Washington Mutual Inc. to one notch above junk, citing Washington Mutual Inc.'s long-term exposure to the mortgage crisis and uncertainty about the company's ability to raise capital.  See Dana Aubin, *Moody's Downgrades Washington Mutual's Rating*, Reuters.com (March 14, 2008).

201.   On July 23, 2008, Standard & Poor's downgraded the company's credit rating to BBB-, just above junk status after Washington Mutual Inc. announced a $3.3 billion second quarter loss.

202.   On July 23, 2008, Reuters reported:

> "The one notch downgrade by S&P to 'BBB-minus' follows announcement by rival rating agency Moody's Investors Service on Tuesday that it may downgrade the thrift to 'junk' status. S&P also cut short-term rating to 'A-3,' the fourth highest rating, from 'A-2.'  S&P said its current ratings reflect expectations that the thrift will post a loss in 2008 and will return to profitability in 2009.
>
> However, if residential mortgage credit losses exceed the expected $19 billion loss, the ratings may drop lower, the rating company said."  See Anastasija Johnson, *S&P Cuts Washington Mutual to Just Above Junk*, Reuters.com (July 23, 2008).

203.    On July 23, 2008, Northern Trust's Fixed Income Research division commented on Washington Mutual's adequacy of loss reserves and capital, noting "high loss expectations," but failed to take any action to protect LACERS' cash collateral investments.

204.    Between July 23, 2008 and September 24, 2008, Fitch, Moody's and Standard & Poor's continued to downgrade Washington Mutual based on the billions of dollars in risky mortgages on its books.

205.    During this entire time period, Northern Trust's Fixed Income Research Department, which is charged with reviewing and monitoring developments in the financial services industry generally, and individual companies like Washington Mutual specifically, did not have an internal rating on Washington Mutual as a matter of company policy.

206.    Yet despite these and numerous other warning signs regarding the impropriety of the Washington Mutual investment, which a sophisticated investor manager such as Northern Trust would have recognized as posing significant risk to LACERS' cash collateral investments, Northern Trust  failed to respond to the clear signs of a growing crisis.  Indeed, rather than actively manage LACERS' cash collateral investments to mitigate the risk it created, Northern Trust adopted the untenable position that securities held by LACERS would pay fully if held to maturity, and that securities that incurred unrealized losses (when the market value of the security fell below the book value of the security) would not be sold.  Northern Trust's position effectively turned LACERS' cash collateral into long-term securities, many of which would not mature for years. But long-term securities are not an appropriate investment under the Guidelines.

207.    On September 25, 2008, Washington Mutual Inc. was seized by the Federal Deposit Insurance Corp. ("FDIC"), which sold the company's banking operations to JPMorgan Chase for $1.9 billion, a downfall that had been "widely anticipated for some time because of the company's heavy mortgage-related losses." See "Washington Mutual Falls to Subprime Mess," CBSNews.com (September 26, 2008).  By virtue of Northern Trust's failure to properly invest and manage LACERS' cash collateral, the securities purchased from Washington Mutual totaling $81,625,000 have resulted in a realized loss of $46,022,371.

208.    By investing in Washington Mutual and failing to take action in the face of the decline in value, Northern Trust acted with knowing reckless disregard of its representations to make "low risk" investments.

**M.      Northern Trust Misrepresented That The Investment in CIT Group Bonds Was "Low Risk," Knowing That It Was A Very High Risk Investment**

209.    On or about March 14, 2007, Northern Trust purchased the bonds of CIT Group Inc. ("CIT") with a par value of $50,000,000.

210.    Northern Trust knew or acted with reckless disregard to the risk of this investment and its unsuitability for LACERS.

211.    By making this investment in the Securities Lending Program, Northern Trust represented that the investment was "low risk." Northern Trust knew that the investment involved a high level of risk, but failed to inform LACERS of this fact.

212.    The Prospectus stated that "[t]he Notes are a new issue of securities with no established trading market...The trading market for the Notes may not be liquid." Pricing Supplement No. 18, March 7, 2007, p. 4.

213.    During the first half of 2007 CIT incurred over $1.5 billion in write-downs, charges and provisions for losses tied to its portfolio of subprime mortgage loans.

214.    At the end of June 2007, 6.6 percent of the loans in the company's managed home loan portfolio were delinquent by 60 days or more, according to financial statements. By March 30, 2008, almost 13 percent of the portfolio was 60 days delinquent. Fewer than 50 percent of the loans in the portfolio were fixed-rate loans, suggesting that many of CIT's loans were adjustable-rate mortgages, which have proved particularly susceptible to trouble.

215.    On July 18, 2007, the Chief Executive of CIT, Jeffrey Peek, stated in a conference that the mortgage business had a "problematic outlook" and CIT was not willing to spend more to add scale and boost returns. See New York Times, August 27, 2007, *CIT Group Closes Mortgage Unit, Cuts 550 Jobs.*

216.    On August 27, 2007, CIT announced that it was closing its mortgage lending business and laying off 550 employees. *Id.* The New York Times reported that "CIT joins dozens of mortgage lenders to leave the industry after delinquencies and defaults soared, housing prices

1    stagnated or began to fall, and investors wary about risk stopped buying securities backed by

2    many kinds of home loans." *Id.*

3        217.    During 2008 the rating organizations continued to downgrade CIT.

4        218.    On or about March 20, 2008, CIT Group shares and bonds plunged. "The

5    company's $500 million of 5.6 percent notes due in 2001 slumped to as low as 66.5 cents on the

6    dollar, according to Trace, the Financial Regulatory Authority's bond-pricing service. The notes

7    last-traded at 93 cents on the dollar on Feb. 26." Bloomberg, *CIT Taps $7.3 Billion of Bank Lines*

8    *Amid Disruption.*

9        219.    On or about May 30, 2008, Moody's downgraded CIT's senior unsecured rating

10   from A3 to Baa1. "The downgrade was made because the potential magnitude of losses in the

11   home lending portfolio are uncertain and could hamper CIT's ability for 're-establishing solid

12   footing in the credit market,' Moody's said." Forbes, May 30, 2008, *CIT to Moody's: Don't*

13   *Downgrade Us!*

14       220.    By mid- 2008, CIT had disposed of its portfolio of subprime mortgages, receiving

15   less than half of what the company had previously claimed the assets were worth.

16       221.    By mid- July, 2009, CIT Group was on the verge of collapse. "CIT Group Inc.

17   bonds plunged on concern that the century-old lender, which has been unable to persuade the

18   government to back its debt sales, won't be able to meet its credit obligations". Wealth Daily, *Is*

19   *CIT Group 'Too Big To Fail?*, July 14, 2009.

20       222.    On November 1, 2009, CIT Group filed for bankruptcy.

21       223.    In making the foregoing investment and failing to take action in the face of its

22   deterioration, Northern Trust acted with knowing disregard of its representations that it made

23   "low risk" investments in the Securities Lending Program.

24       **N.    Northern Trust Misrepresented That The Investment in Lehman Brothers**
         **Bonds Was "Low Risk," Knowing That It Was A Very High Risk Investment**

25       224.    On or about May 25, 2007, Northern Trust purchased $25,000,000 in bonds issued

26   by Lehman Brothers, with a maturity date of May 25, 2010, on behalf of LACERS.

27       225.    Like Washington Mutual, Lehman was heavily entrenched in the subprime

28   mortgage industry. The rapid increase in mortgage defaults and home foreclosures between 2005

and 2007, at precisely the time when Lehman had expanded its mortgage-related business and had amassed a portfolio of nearly $90 billion in mortgage-backed assets, compromised the value and diminished the marketability of these assets on its balance sheet.

226.    Northern Trust knew of Lehman's difficulties not only from the widely publicized mortgage meltdown (discussed supra), but from a whole host of specific warning signs regarding the risks of investing in Lehman's securities.

227.    As detailed above, by the time of Northern Trust's acquisition of the Lehman Brother's securities, the subprime crisis was already prominent in the news.

228.    On or about August 23, 2007, Lehman announced that it was shutting down one of its home lending units and laying off 1,200 employees.  This announcement came within days of the announcement that Greenpoint Mortgage was shutting down its mortgage business, and three days after CIT Group announced the closing of its mortgage origination business.  The *New York Times* noted that: "In the last 12 months, defaults on mortgages have surged as home prices have started falling.  The worsening performance of the loans has squelched demand for mortgage-backed securities." New York Times, *Lehman Closes Subprime Limit and Lays Off 1,200*, August 23, 2007.

229.    In January 2008, when Lehman filed its 2007 Form 10K, it disclosed $89.1 billion in mortgage and asset-backed securities, but took write downs totaling $4.7 billion due to increased delinquencies.

230.    In March 2008, Standard & Poor's warned that it might downgrade Lehman's credit rating from "stable" to "negative", indicating that it expected Lehman to experience up to a 30% drop in profit for the year because "we see some possibility, were there to be persisting capital markets turmoil and sharply weakening economic conditions, that financial performance could deteriorate significantly more than we now assume, which would call the current ratings into question." Tom Bawden, *Goldman Sachs and Lehman Brothers Face Downgrading*, The Times (March 22, 2008).

231.    In March 2008, Bear Stearns collapsed and rumors that Lehman was going to go the way of Bear Stearns were circulating.

Exhibit A Page 61

232.   On March 18, 2008, Bloomberg's Business Web ran the article: *Is Lehman Liquid Enough?*, stating that "[t]he firm's heavy subprime exposure and minimal write downs to this point have investors nervous. . . the worry now on Wall Street is that the high-stakes game of dice the big firms were playing with asset-backed securities of dubious quality may force more players to exit the table. . .Some figure Lehman Brothers (LEH) may be vulnerable to a liquidity seize-up.  Shares of Lehman took a beating March 17 because the similarity of its business model to that of Bear Stearns."

233.   On June 16, 2008, Lehman reported a then record loss of $5.14 per share, driven by write-downs in security positions.

234.   Between May 2008 and September 2008, Fitch, Moodys, and Standard & Poor's lowered credit ratings on Lehman to the following:

| | |
|---|---|
| Moody's | A2/On Review - uncertain |
| S&P | A/On Review - developing |
| Fitch | A+/On Review for downgrade |

235.   Lehman was heavily leveraged - by the end of August 2008, Lehman had $600,000 billion of assets financed with just $30 billion in equity.

236.   On September 9, 2008, Standard & Poor's announced that it might downgrade Lehman because of "higher uncertainty about the firm's ability to raise capital given its declining share price." See *S&P May Downgrade Lehman Brothers' Ratings*, MarketWatch.com (September 9, 2008).  Additionally, there were many ratings downgrades:

Fitch

| Date | Rating |
|---|---|
| 06/28/07 - upgrade | AA- |
| 06/09/08 - downgrade | A+ |
| 09/15/08 - downgrade | CCC |
| 10/27/08 | NR – rating withdrawn |

Moody's

| Date | Rating |
|---|---|
| 07/17/08 - downgrade | A2 |
| 09/15/08 - downgrade | B3 |
| 12/08/08 | C |
| 12/10/08 | WR – rating withdrawn |

Standard & Poor's

| Date | Rating |
|---|---|
| 06/02/08 - downgrade | A |
| 09/15/08 - downgrade | CCC- |
| 09/16/08 - downgrade | D |
| 09/25/08 - downgrade | NR – rating withdrawn |

237.    In light of all of the foregoing facts, Northern Trust, in the exercise of due care and fiduciary duty, should not have purchased Lehman securities, or, at the very least, should have liquidated the investment.

238.    Yet again, despite these, and numerous other warning signs regarding the impropriety of the Lehman's investment, Northern Trust adopted the untenable positions that the securities would pay fully if held to maturity, and that securities that incurred unrealized losses (when the market value of the security fell below the book value of the security) would not be sold. Northern Trust failed to reduce LACERS' exposure to the securities issued by Lehman, contrary to Northern Trust's investment guidelines which placed "safety of capital" as a pre-eminent goal. On September 14, 2008, Lehman Brothers filed for bankruptcy.

239.    By investing in Lehman Brothers bonds and failing to take action in the face of the increased risk caused by the deterioration of the investment, Northern Trust knowingly or recklessly disregarded its representations to make "low risk" investments.

240.    Northern Trust purchased the Lehman bonds for its commingled cash collateral pools. These are pools in which Northern Trust invested the assets of its pension clients, such as LACERS.  Thus, LACERS owned a percentage share of certain commingled cash collateral

pools, based upon the percentage of the pool that LACERS owned.

241.   As of September 18, 2008, Northern Trust's Core USA Pool held $74 billion in assets. On that date, Northern Trust declared a cash collateral deficiency of $886 million in that pool. Of that amount, $100 million was a collateral deficiency attributable to the investment in Lehman bonds.

242.   As of that date, the Global Core Pool held $19 billion in assets, had a collateral deficiency of $192 million, and a $17 million collateral deficiency attributable to the Lehman bonds.

243.   As of that date, the Core Pool had $3.6 billion in assets, had a collateral deficiency of $49 million, and a $ 4 million collateral deficiency attributable to the investment in Lehman bonds.

244.   The fact that Northern Trust purchased Lehman bonds that were held in commingled collateral pools affected the actions of Northern Trust, as more fully discussed below.

**O.   Northern Trust's Breach of Its Contractual and Fiduciary Duties Arose Out Of Its Multiple Conflicts Of Interest**

245.   Northern Trust was motivated to invest LACERS' cash collateral in risky, long-term securities because of a compensation scheme that gave rise to a conflict of interest.

246.   Specifically, Northern Trust shared in the returns generated from the investment of cash collateral in such securities—taking up to 15% of the earnings generated therefrom. Northern Trust perceived that it bore no downside risk on any losses absent negligence.  See Securities Lending Agreement, paragraph 3.7.   As a result, Northern Trust stood to materially gain, and did materially gain, by investing LACERS' funds in high risk securities that generated greater returns, despite the additional credit and liquidity risk inherent in those investments and despite the fact that they were wholly inappropriate for the pension fund.

247.   In short, Northern Trust was playing with the house's money under the concept of "heads we win, tails you lose." Plaintiff is informed and believes and thereon alleges that this conflict drove Northern Trust to invest LACERS' cash collateral in risky and long-term securities, and to maintain significant exposure to mortgage-backed securities, exotic investments

backed by mortgage-backed securities, and securities issued by financial institutions that themselves had significant exposure to those same mortgage markets, all of which were inappropriate for, and inconsistent with, the clear investment objectives and guidelines for investment in highly liquid, safe, short-term securities.

248.    Plaintiff is informed and believes and thereon alleges that another conflict of interest prevented Northern Trust from selling securities in the Custom Account at a loss, even if done to mitigate risk and avoid potentially larger losses.  Plaintiff is informed and believes and thereon alleges that Northern Trust's accounting rules required Northern Trust to record on its books realized losses (such as by selling securities at a loss).  Such an event would have resulted in multi-billion dollar losses, exposing Northern Trust to liability for those losses.  Thus, by continuing to hold securities that had incurred unrealized losses, and that were at risk for failure, Northern Trust avoided the ramifications of realized losses.

249.    Plaintiff is informed and believes and thereon alleges that Northern Trust's self-interest rather than an unbiased assessment of the best interests of LACERS motivated Northern Trust to retain the assets that were destined to fail in the face of the subprime mortgage collapse and growing financial crisis.

250.    Plaintiff is informed and believes and thereon alleges that still yet another conflict of interest prevented Northern Trust from selling the securities at a loss, even if done to mitigate risk and avoid potentially larger losses.  Northern Trust invested in Lehman Brothers' notes, when Lehman Brothers was also a "borrower" in the Securities Lending Program.  Plaintiff is informed and believes and thereon alleges that the conflict of interest arising from Northern Trust's dealings with Lehman Brothers contributed to Northern Trust's decisions, and subsequent actions, in adopting the untenable position that the Lehman note would pay fully if held to maturity.

251.    Plaintiff is informed and believes and thereon alleges that yet another conflict of interest prevented Northern Trust from selling securities at a loss, even if done to mitigate risk and avoid potentially larger losses. Northern Trust created a conflict of interest by virtue of its creation of commingled investment pools.  That is, Northern Trust invested the cash collateral of

LACERS in commingled pools with the cash collateral of hundreds of other pension funds who contracted with Northern Trust for securities lending services.

252.    When Lehman Brothers declared bankruptcy on or about September 15, 2008, a crisis of confidence developed.

253.    Northern Trust feared, and sought to prevent, a stampede of pension funds seeking to liquidate the investments which Northern Trust had made for them in Lehman securities and other securities.

254.    Northern Trust created the problem by improperly investing in Lehman securities for hundreds of other pension funds.

255.    Northern Trust owed a single, undivided fiduciary duty to LACERS, the same single undivided fiduciary duty it owed to hundreds of other pension funds who invested in the collateral pools.

256.    If all the pension funds decided to liquidate their holdings in Lehman at once, then the entire commingled collateral pools were going to collapse. In effect, there would be a "run on the bank".

257.    A collapse of the pool would cause a catastrophic loss to Northern Trust.

258.    To prevent such a collapse, Northern Trust embarked upon a strategy to save the collateral pools by convincing the various pension funds to stay invested in the pools (and hence in Lehman investments) and not to pull their money out of the pools by liquidating their investments in Lehman.

259.    Northern Trust thus put its interest in saving the collateral pools above the interest of individual pension funds, such as LACERS.

260.    Northern Trust created a conflict of interest between and among the hundreds of pension fund clients invested in the commingled pools.

261.    Northern Trust created a conflict of interest which made it impossible for Northern Trust to advise LACERS, or any other pension fund, to pull its money out of the pools. Northern Trust never did so, even though it was, or might have been, in the best interest of LACERS to liquidate its investment in Lehman securities immediately, to realize a small loss, in

1   2008, rather than to wait and realize the much larger loss that was realized in 2010.

2       262.    Consequently, Northern Trust failed to adhere to its promise to act, first and

3   foremost, to preserve the principal investment of LACERS, when it advised LACERS to remain

4   invested in Lehman – a course of action that produced disastrous results for LACERS.

5   **P.    Northern Trust Declared a "Collateral Deficiency" And Made a $150 Million Cash Contribution to the Collateral Pools**

6       263.    On or about September 19, 2008 – a few days after the announcement of the

7   Lehman bankruptcy filing– Northern Trust declared a "collateral deficiency" with respect to five

8   of its commingled cash collateral investment pools.

9       264.    The declaration of a "collateral deficiency" was a statement that the value of the

10   collateral (e.g., the investment in Lehman) had fallen to such an extent that there was insufficient

11   money to pay back the borrowers in the securities lending agreements managed by Northern

12   Trust.

13       265.    On or about September 29, 2008, Northern Trust made a cash payment of $150

14   million to the collateral pools.  The cash contribution was an admission that Northern Trust had

15   mismanaged the securities lending agreements of its pension fund customers, including

16   LACERS.

17       266.    According to the Securities Lending Collateral Schedule, p. 8, Northern Trust was

18   "[i]n no event. . .personally liable to restore any loss within a cash collateral fund, unless the loss

19   was directly caused by the negligence or intentional misconduct of Agent."

20       267.    Northern Trust's cash payment was made in recognition of its own liability.

21       268.    Northern Trust announced its actions in a conference call on September 28, 2008

22   with clients. The substance of that call is reported in a web site blog entitled *Hedgefinger*, under

23   the title, *Unintended Consequences: Lehman Collapse Undermines Northern Trust*. That site

24   reports the following: "[t]he full extent of the losses will depend on whether clients rush to take

25   their money out—thereby forcing a fire sale of illiquid assets – or agree to wait until the dust

26   settles, the [Northern Trust] official said in the call, which was for clients only."

27       269.    Money market funds aim to maintain what is called a net asset value, or NAV, of

28   $1.00.  That means that every dollar an investor puts in is worth a dollar at all times.  Gains are

1   credited to customers and distributed as cash or new shares.  If a fund's share value drops below

2   $1 because of an investment loss, it is called "breaking the buck."

3       270.    To calculate the NAV, the managers need to be able to assign a value to their

4   holdings.  Northern Trust "broke the buck" on or about September 18, 2008 because of its

5   investments in Lehman bonds.

6       271.    According to Roger Merritt, who headed the fund-rating team at Fitch in New

7   York, "the best way to get your dollar back [in this situation] is to ask for it before anybody else."

8   Bloomberg, "Special Report," *Sleep-At-Night- Money Lost in Lehman Lesson Missing $63*

9   *Billion*, September 8, 2009, available at www.Bloomberg.com.

10      272.    Thus, each investor is competing against every other investor.  Northern Trust

11  created a situation where each pension fund was competing against every other pension fund.

12  **Q.    Northern Trust Convinced LACERS and Other Pension Funds Not To
          Liquidate Their Investments In Lehman Securities And/Or The Commingled
          Pools**

13      273.    From September, 2008, or before, Northern Trust embarked upon a concerted

14  effort to persuade its clients not to liquidate their investments in Lehman securities, or in the

15  commingled pools, by assuring them that they had sustained only "unrealized losses" – as

16  opposed to "realized losses";  that these "unrealized losses" would be "reversed" when market

17  conditions improve sometime in the future; and that a mass exodus from the commingled pools

18  should be avoided.

19      274.    For example, Northern Trust sent two representatives to meet with the City of

20  Pontiac, Michigan General Employees Retirement System on October 29, 2008. According to the

21  minutes of that meeting, Mr. David Gray of Northern Trust "reviewed the securities lending

22  process".  He reported that "CORE USA is an unregistered commingled fund and not a money

23  market fund. Some of the notes contained in the fund are floating rate notes. This allows

24  investors to obtain *almost risk-free returns."* (emphasis added).

25      275.    When asked to explain the "collateral deficiency," Mr. Gray stated that

26  "Lehman Brothers is responsible for 11% of the collateral deficiency in the portfolio [and that]

27  the other 89% was due to the lack of liquidity.  As the markets recover the value can be

28

reclaimed".

276.   In a further meeting held on November 6, 2008, Mr. Gray presented an optimistic view of holding on to the Lehman securities: "He said that the majority of these [securities] are unrealized losses. They [Northern Trust] feel that the distressed value will return to par by 2011. The one exception is a Lehman Brothers Security, which they expect to regain a portion of its value".

277.   Mr. Gray also sought to persuade the pension fund not to liquidate its investment: "Mr. Smith stated that if they [Northern Trust] let 50% of the clients out they would take all the liquidity [out of the fund]. They [Northern Trust] have to make sure that all clients are treated in the same way by assessing an exit fee."

278.   On December 4, 2008, Northern Trust repeated the same themes in a letter written by William A. Osborn, Chairman, Northern Trust Corporation. Mr. Osborn was responding to a letter dated November 21, 2008, signed jointly by representatives of LACERS and five other pension funds in California. Mr. Osborn explained that "we declared a collateral deficiency to recognize not only the impairment of certain assets (Lehman Brothers bonds) but also a decline in the market value if the collateral held in the five constant dollar pools".

279.   Mr. Osborn then went on to state: "But it must be emphasized that these losses are *unrealized*; if the debt instruments still in the collateral pools are paid in full at maturity, the losses will be reversed and the payable owed by clients who remain in the securities lending program will be reduced." (emphasis added).

280.   Mr. Osborn indicated that Northern Trust had, in fact, declared the "collateral deficiency" as a means of preventing the pension funds from pulling out of the commingled pools: "If we had failed to take this action, participants could have pulled out of pooled funds, leaving a larger potential loss to remaining participants should the market not recover. The declaration of a collateral deficiency ensures that *if* the unrealized losses become permanent, they will be shared equally among all participants in the securities lending pools". (emphasis in original).

281.   This letter illustrates the conflicts of interest that Northern Trust created. Northern

Trust claimed, in essence, to be acting benevolently and altruistically, to prevent some pension fund participants from leaving the pools early because they might injure those other pension fund participants who decide to remain in the commingled pools. But each such decision is an individual decision to be made by each participant.

282.     Northern Trust owed a separate, independent duty to advise LACERS as to what was in the best interest of LACERS – which Northern Trust failed to do.  Northern Trust put its interest first, ahead of the interests of its clients. That interest was in preserving the commingled pools for Northern Trust to run, at a profit to itself.

R.     **Northern Trust Made Evasive and Misleading Communications to LACERS**

283.     LACERS requested that Northern Trust provide "a written report by October 10, 2008 of the actions taken, actions considered and disregarded, or conversations and deliberations regarding holdings of WaMu and Lehman in the LACERS and other TNT securities lending collateral reinvestment accounts".

284.     Northern Trust, through Andrew Clayton, Senior Vice President, Head of Global Securities Lending, responded with an email on October 1, 2008 assuring LACERS that "Northern Trust is  committed to providing open communication that is vitally important to your peace of mind, especially during times of turmoil."

285.     Northern Trust provided "Northern Trust Responses to LACERS" on or about October 13, 2008.  This response was intended to provide LACERS with "peace of mind".  The response was false and misleading by omission, in failing to make full disclosure to LACERS.

286.     For example, LACERS asked Northern Trust– "[w]hat if any discussion was there of decreasing or heading our exposure to WaMu (or Lehman) during each of the periods of price declines and/or rebounds or as a result of ratings downgrades..." Northern Trust never answered the question fully or adequately but provided evasive answers.

287.     For example, Northern Trust stated: "November 6, 2007 [some nine months after the initial investment in Washington Mutual Bank on February 16, 2007] --Internal rating outlook changed on holding company. FIR does not have internal rating on Washington Mutual Bank as a matter of policy".

288.    Northern Trust did not explain what the internal rating of the holding company was or why it changed.  Northern Trust merely noted that it changed.  Northern Trust did not explain why FIR [Northern Trust's Fixed Income Research] did not have an internal rating on *Washington Mutual Bank* as a matter of policy; what that policy was; or the reason for that policy.  The investment made by Northern Trust was in bonds issued by the *Bank*, not the holding company.

289.    In another example containing significant omissions,  Northern Trust stated: "March 6, 2008 – S&P put WM and related on review for downgrade. FIR comments." Northern Trust did not explain what FIR had in fact commented, only that it commented.

290.    In another example containing significant omissions, Northern Trust stated: "July 23, 2008- Second quarter earnings [of WAMU] are announced, following ratings downgrades. FIR opines on adequacy of loss/reserves/capital given high loss expectations".  Here again, Northern Trust did not explain what opinions FIR did in fact express about WAMU, only that FIR gave opinions.

291.    In another example containing significant omissions, Northern Trust stated: "September 12, 2008– S&P changes outlook on WM and related entities. FIR comments and notes takeover potential". Here again, Northern Trust did not explain what opinions FIR did express about WAMU.

292.    With respect to the investment in Lehman Brothers, Northern Trust did not answer the question asked. Northern Trust provided a "Timeline" that is notable for what it does not say, rather than for what it does say.  For example, Northern Trust noted:  "June 16, 2008, Lehman reported a then-record loss of $5.14 per share, driven by write downs in security provisions." The "Timeline" is otherwise blank for this date, indicating that Northern Trust did not have any discussion, at all, about decreasing the exposure of LACERS to the Lehman investment as the result of this record loss.  Assuming that Northern Trust did have some discussion about the  "then-record loss" (as one would expect a fiduciary to do) then it misrepresented that fact by omitting the discussion from the "Timeline"

293.    Ironically, the Northern Trust web site, under the heading of "Securities Lending,"

contains a link (called "Read More") to the International Securities Lending Association ("ISLA") brochure entitled, "Securities Lending: Your Questions Answered". That brochure, at page 13, contains the heading: "WHAT HAPPENED WHEN LEHMAN BROTHERS COLLAPSED?". The brochure explains: "Lehman Brothers, which was a major prime broker and borrower of equities and bonds, collapsed in late 2008. In the weeks up to its failure, many lenders had eliminated or reduced their securities lending exposures to the bank, taking advantage of the fact that most loans are callable, so that lent securities must be returned within the normal settlement cycle on demand. Others had tightened collateral eligibility guidelines or raised margin levels."

294.   The ISLA brochure continues: "Most lending agents also took the approach of selling collateral in order to buy back lent securities in the market. In this way, lenders were restored to their original position of owning the lent securities. Any net exposure to Lehman was then calculated as the cost of repurchasing the lent securities less the funds from the sale of the collateral...Given the margin requirements on collateral, *most lenders were left with a surplus*, even after deducting their costs... ISLA believes *few lenders in fact suffered material losses*." (emphasis added).

295.   This brochure – along with the "Supplemental Securities Lending Statement of September 2009," discussed below – created the impression that Northern Trust had not caused any economic loss by its investment in Lehman Brothers.

296.   The evasive, misleading answers supplied by Northern Trust to questions from LACERS were intended to mislead LACERS into believing that Northern Trust had fulfilled its obligation to continually monitor investments for their suitability to LACERS. Northern Trust was attempting to obfuscate and hide its failure to provide such monitoring.

**S.     Northern Trust Continued to Provide Misleading Assurances to LACERS in 2009**

297.   Northern Trust continued to assure LACERS by providing additional comfort about the investments in question. Northern Trust provided a "Supplemental Securities Lending Statement/September 2009" to LACERS, with a date of September 8, 2009. That Statement set forth "Realized Losses to Date" in the Global Core Collateral Pool as follows:

| | | |
|---|---|---|
| Lehman Brothers | $214,799 | |
| CIT Group | $47,291 | |
| Total Realized Losses to Date | $262,091 | |

298.    That Statement contained the following "Actions taken by Northern Trust to Support Clients":

| | |
|---|---|
| Your Share of the 2008 Cash Contribution | $285, 499 |
| Your benefit from Adjusted Fee Split | |
| (Estimated through July 2009) | $337,954 |
| Your Total Benefit from Northern Trust Actions | $623,453 |

299.    The  Statement then contained the following information that was highlighted in a bold, square box:

"Your Total Benefit from Northern Trust Actions may largely offset your

 Total Realized Losses to Date."

300.    Northern Trust thus provided assurances to LACERS that LACERS had not yet realized any actual, financial losses.  According to Northern Trust, the LACERS's "share" of Northern Trust's 2008 Cash Contribution–  $285,499 – in effect offset and wiped out the "Total Realized Losses to Date" of $262,091.

301.    According to Northern Trust, LACERS had not sustained an actual, financial loss, but, on the contrary, had benefitted economically in the sum of $361,362 (the total benefit of $623,453 minus the realized losses of $214,799).

302.    Northern Trust knew that these statements were misleading.  Northern Trust knew and should have known that, as of September 8, 2009 LACERS, had sustained substantial unrealized losses, which were not shown on the statement.  Northern Trust delayed providing notice of these losses.  It was not until October 25, 2010 that Northern Trust provided a statement to LACERS showing realized losses in the sum of $95,754,266.

**T.    Northern Trust Made Knowingly False Statements in 2010**

303.    Northern Trust made false statements to explain and justify the losses sustained by LACERS – putting the blame on a "global crisis" rather than upon its own imprudent investment

1   decisions.

2       304.    On March 29, 2010 Northern Trust stated that "[i]t is the global crisis, which was

3   both unforeseen and unforeseeable, that ultimately led to the realized losses LACERS suffered –

4   not the adoption of the investment guidelines".

5       305.    This statement was knowingly false because Northern Trust knew that the realized

6   losses were caused by Northern Trust's decision to invest in securities tied to the housing market

7   and mortgage originations, despite the warnings of its Chief Economist, described above, from

8   2004-2008. Northern Trust knew that the losses were, in fact, foreseen and foreseeable by Mr.

9   Kasriel and by Northern Trust itself.

10      306.    It was not, for example, "the global crisis" which caused LACERS to incur losses

11  from the investment in the GreenPoint Mortgage Funding Trust. The losses were caused by the

12  failure of the homeowners in question to repay their mortgages. This was a risk – mortgage

13  defaults– that Mr. Kasriel identified and predicted before and after Northern Trust made the

14  investment in GreenPoint. This was also a risk that the Prospectus identified. This risk was

15  clearly foreseen and foreseeable.

16      307.    Northern Trust made additional, knowingly false statements on March 29, 2010:

17          "Northern Trust acted promptly and prudently by taking measures early on to

18          protect its securities lending clients. As one example, in 2007, we implemented

19          certain temporary investment practices across the various collateral vehicles

20          (including the LACERS Fund) designed to build up liquidity in the respective

21          vehicles. In the case of the LACERS Fund, such practices included:

22                              *  *  *

23          *Since March 2007, no new investments with credit risk were purchased with*

24          *maturities beyond one week*". (emphasis added).

25      308.    These statements were knowingly false because Northern Trust made the

26  investment in Lehman Brothers on May 25, 2007; the investment had a credit risk; and the notes

27  had a maturity of "three months or more". Prospectus Supplement, May 30, 2006, at 1, 17. In

28  other words, Northern Trust knew that: 1) it made the investment after March, 2007; 2) the

1    investment had a credit risk; and 3) the notes had a maturity longer than one week.

2    **U.    PCA Failed to Review or Monitor Northern Trust's Investments in the
       Securities Lending Program While Charging Fees for This Service**

3    309.    The Board of Administration of LACERS entered into Contract 349 for "General

4    Pension Fund Consulting Services" with PCA on or about July 5, 2006, effective July 1, 2006

5    through June 30, 2009, subsequently extended through December 31, 2010.  A true and correct

6    copy of the contract is attached hereto as Exhibit C.  The contract was signed by Allan Emkin, as

7    Managing Director of PCA, with the address of 15760 Ventura Blvd., Encino, California 91436.

8    The contract required these services by PCA among others:

9    "I.    **SERVICES**

10    A.    Performance Evaluation

11         The Contractor shall review on a quarterly and annual basis the current

12         and historical investment performance of the City Employees' Retirement

13         Fund (hereinafter referred to as "the Fund").  Included in the review will

14         be a consideration of asset allocation, cash flow, and the performance of

15         various asset classes.  The review will analyze the performance of the

16         Fund and the Fund's managers.

17    B.    Investment Policy and Asset Allocation

18         The Contractor shall assist the Board in reviewing and/or developing

19         investment policies for the System.  The assistance shall include, but not

20         be limited to, preparing an asset-liability asset allocation study, reviewing

21         and making asset allocation recommendations, and recommending

22         performance benchmarks and guidelines for investment advisors."

23    310.    PCA failed to advise LACERS about the nature, purpose, and extent of risk

24    created by the investment strategy of Northern Trust in securities lending.

25    311.    PCA failed to advise LACERS that Northern Trust had made high risk,

26    imprudent investments for LACERS.

27    312.    PCA failed to advise LACERS that Northern Trust had not created a money

28    market like investment fund for LACERS, but had, to the contrary, created and managed a fund

1    with excessive and imprudent risk.

2        313.    PCA failed to advise LACERS that Northern Trust's reporting of securities

3    lending investments was deficient and in breach of Northern Trust's representations.

4        314.    PCA failed to analyze the performance of Northern Trust in the Securities

5    Lending Program on a quarterly or annual basis.

6        315.    PCA failed to advise LACERS about or recommend suitable guidelines for the

7    Securities Lending Program.

8    **V.    PCA Failed to Perform the Duties Required Under LACERS' Investment Policy**

9        316.    LACERS' Investment Policy, approved June 24, 2008, set forth the "Duties of the

10   General Investment Consultant" and required that the General Investment Consultant (PCA) shall

11   be responsible to : " [r]eview quarterly performance including performance attribution on the

12   Board's managers and total assets, including a check on guideline compliance and adherence to

13   investment style and discipline"; and to "[m]ake recommendations for Board presentation

14   regarding investment allocation and strategic asset allocation."

15       317.    PCA failed to perform these duties with respect to the Securities Lending

16   Program.

17   **FIRST CAUSE OF ACTION**

18   **VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200**

19   **(Plaintiff People of the State of California Against Northern Trust)**

20       318.    Plaintiff the People realleges and incorporates by reference the preceding

21   allegations as if fully set forth herein.

22       319.    Northern Trust's acts and practices in connection with its management of

23   LACERS' accounts as described herein constitute unlawful, fraudulent and/or unfair business

24   practices within the meaning of Business and Professions Code section 17200 *et seq.* in that:

25   (1) the justification for Northern Trust's conduct is outweighed by the gravity of the

26   consequences to LACERS; (2) Northern Trust's conduct is unfair, oppressive, unscrupulous,

27   unconscionable or substantially injurious to LACERS; and/or (3) the conduct of Northern Trust

28   had a tendency to deceive LACERS.

Complaint

63

Exhibit A Page 76

320.    As alleged herein, Northern Trust's unlawful, unfair and/or fraudulent business acts and practices in connection with its management of LACERS' cash collateral include, but are not limited to:

(a)    misrepresenting that Northern Trust had made "low risk" investments, knowing that its investments were not "low risk," but high risk;

(b)    violating Civil Code section 3372 by not providing investment advisory services with the due care and skill reasonably to be expected;

(c)    failing to disclose that Northern Trust had changed its investment strategy from safe, short term investments to risky, long term investments;

(d)    failing to inform LACERS when the market value of the investments fell below the purchase price of those investments;

(e)    creating misleading and inadequate Guidelines;

(f)    failing to preserve the principal of the Securities Lending Program, as Northern Trust had promised;

(g)    concealing and misrepresenting losses in the Securities Lending Program;

(h)    creating conflicts of interest whereby Northern Trust disloyally placed its interests above the interests of LACERS in connection with the management of LACERS' cash collateral, making a profit while LACERS suffered losses as a result of Northern Trust's management of its Securities Lending Program;

(i)    failing to manage LACERS' cash collateral pursuant to the SLP's Investment Manage Objectives and Guidelines for the narrowly stated purpose to "maximize current income" in a manner "consistent with the preservation of capital and maintenance of liquidity";

(j)    failing to completely, thoroughly and on an on-going basis follow and monitor the investment of LACERS' cash collateral in securities issued by Washington Mutual, Lehman, GreenPoint, CIT and other investments, and failing to monitor the risk associated with such investments which, if

performed, would have revealed, among other things, the substantial and unacceptable risk of loss that would leave LACERS at risk of not recovering all principal invested;

(k) imprudently maintaining the cash collateral received by LACERS in securities issued by Washington Mutual, Lehman, GreenPoint, CIT and other investments after Northern Trust became aware or should have become aware of analysts' warnings concerning the investments, their dire financial condition, and their likely failure;

(l) repeatedly misrepresenting, by omission, that Northern Trust's Chief Economist had warned of the risks in the housing bubble, mortgage meltdown, subprime mortgage, and home equity mortgage;

(m) failing to provide the reports required under the Securities Lending Program;

(n) repeatedly omitting to advise LACERS of the conflicts of interest Northern Trust created, as alleged herein, which prevented Northern Trust from acting in LACERS' exclusive interest in connection with its management of LACERS' cash collateral pursuant to the SLP, with the result that Northern Trust deceptively profited from its relationship with LACERS while LACERS incurred massive financial losses;

(o) knowingly misrepresenting, by omission, the risks that LACERS faced by Northern Trust's failure to sell the investments, despite warnings that investments were at greater and greater risk of failure;

(p) knowingly misrepresenting, by omission, the actions and analysis that Northern Trust conducted;

(q) creating conflicts of interest by and between pension funds invested in Northern Trust's commingled pools;

(r) violating the False Claims Act, as alleged herein; and

(s) knowingly making false statement as alleged herein.

321.    Northern Trust disloyally favored its own interests in gambling to make profits without any reasonable regard to losses that could be suffered by LACERS.  Specifically, Northern Trust managed its Securities Lending Program in a manner to earn substantial fees and profits by acting in its own self-interest without sharing any "down-side" risk of loss.  Further, because LACERS would incur realized losses subjecting Northern Trust to liability for those losses, Northern Trust was motivated to retain impaired and at-risk securities rather than selling those securities at a loss to mitigate risk of further losses.  Plaintiff is informed and believes and thereon alleges that these conflicts of interest caused Northern Trust to engage in the acts and practices as more fully described herein, which were fraudulent and unfair business practices within the meaning of Business and Professions Code section 17200 *et seq.*

322.    As a direct and proximate result of Northern Trust's unlawful, fraudulent and unfair business practices within the meaning of Business and Professions Code section 17200 *et seq.* as alleged herein, Northern Trust wrongfully retained monies to which it was not entitled in an amount to be determined at trial.

323.    Northern Trust's violations of Business and Professions Code section 17200 *et seq.* render Northern Trust liable to the People for civil penalties, in addition to restitution, in an amount not to exceed $2,500 per day for each violation.

WHEREFORE, Plaintiff prays judgment against Northern Trust as hereinafter set forth.

## SECOND CAUSE OF ACTION

## VIOLATION OF GOVERNMENT CODE § 12651.et seq.

### (Plaintiff People of the State of California Against Northern Trust)

324.    Plaintiff the People realleges and incorporates by reference the preceding allegations as if fully set forth herein.

325.    This is a claim for treble damages and penalties brought by the City Attorney of Los Angeles under the California False Claims Act, Government Code Section 12650 et seq.

326.    Northern Trust knowingly presented or caused to be presented to LACERS false claims for payment of money for services rendered pursuant to the Securities Lending Agreement, when Northern Trust represented that it had complied with its contractual

obligations:

    (a)    Northern Trust knowingly made false, material misrepresentations that the securities lending investments were "low risk" or "almost risk free", while knowing that the investments were extremely risky;

    (b)    Northern Trust knowingly made false, material misrepresentations that "you are protected from potential securities lending risks," knowing that Northern Trust did not protect LACERS from such risks;

    (c)    Northern Trust knowingly made false, material misrepresentations that its Securities Lending Program involved "minimized risk," knowing that the program did not involve "minimized risk";

    (d)    Northern Trust knowingly breached its representations to maintain the "safety of principal";

    (e)    Northern Trust knowingly concealed from, and failed to advise LACERS, that its Chief Economist had warned of the mortgage meltdown then taking place, before Northern Trust made investments that were reckless and highly risky because of that very mortgage meltdown;

    (f)    Northern Trust knowingly failed to provide reports about securities lending activities, positions, profits, and losses that Northern Trust had promised to provide;

    (g)    Northern Trust knowingly misrepresented the extent of unrealized losses from securities lending activities;

    (h)    Northern Trust knowingly concealed the fact that it had, without prior warning, changed its investment strategy from "low risk", "almost risk free" investments to high risk investments;

    (i)    Northern Trust knowingly breached its contractual obligations to invest in safe, liquid investments;

    (j)    Northern Trust knowingly failed to disclose the riskiness and unsuitability of its investments for LACERS; and

(k)     Northern Trust knowingly made false statements, as alleged herein.

327.    As a proximate result of Northern Trust's actions, Northern Trust caused damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

## VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200

### (Plaintiff People of the State of California Against PCA)

328.    Plaintiff the People realleges and incorporates by reference the preceding allegations as if fully set forth herein.

329.    PCA breached its contractual and fiduciary duties to LACERS by failing to monitor the investments described above, failing to advise LACERS of the risks involved in those investments, failing to analyze Northern Trust's compliance with investment management guidelines, failing to analyze Northern Trust's performance, and failing to analyze Northern Trust's performance under the securities lending program. PCA failed to advise LACERS whether Northern Trust's investments were suitable for the pension fund.

330.    Although PCA prepared many reports to evaluate the performance of LACERS' investments, those reports failed to identify or analyze the increasing the risks of, and the deteriorating performance of, the investments described herein.

331.    PCA was unjustly enriched by receiving compensation for services it failed to perform or performed negligently and inadequately. PCA failed to completely, thoroughly and on an on-going basis follow, analyze, and monitor the investment of LACERS' cash collateral in securities issued by Washington Mutual, Lehman, GreenPoint, CIT Group and other investments. PCA failed to monitor the risks associated with such investments.

332.    PCA failed to advise LACERS that Northern Trust had made investments with excessive risk and imprudent risk.

333.    PCA failed to advise LACERS that Northern Trust drafted and proposed inadequate, misleading guidelines.

334.    PCA failed to advise LACERS of what performance benchmarks and guidelines Northern Trust or LACERS should have adopted for the investments in question.

335.   PCA mistakenly advised LACERS that Northern Trust had created a "money market like" fund, when Northern Trust had failed to do so.

336.   PCA violated California Civil Code section 3372 and the False Claims Act, as alleged herein.

337.   As a direct and proximate result of PCA's breaches of its duties of care as alleged herein, PCA has wrongfully obtained and wrongfully retained monies to which it is not entitled, in an amount to be determined at trial.

338.   As a direct and proximate result of PCA's unfair business practices within the meaning of Business and Professions Code section 17200 *et seq.* as alleged herein, LACERS has been injured in fact and suffered pecuniary loss.

339.   PCA's violations of Business and Professions Code section 17200 *et seq.* render PCA liable to the People for civil penalties, in addition to restitution, in an amount not to exceed $2,500 per day for each violation.

WHEREFORE, Plaintiff prays judgment against PCA as hereinafter set forth.

## FOURTH CAUSE OF ACTION

## VIOLATION OF GOVERNMENT CODE § 12651, et seq.

### (Plaintiff People of the State of California Against PCA)

340.   Plaintiff the People realleges and incorporates by reference the preceding allegations as if fully set forth herein.

341.   This is a claim for treble damages and penalties brought by the City Attorney of Los Angeles under the California False Claims Act, Government Code Section 12650 et seq.

342.   PCA knowingly presented or caused to be presented false claims to LACERS for payment of money for services rendered.

343.   PCA knowingly failed to analyze the performance of Northern Trust in the Securities Lending Program in 2006-2010, while submitting bills for payment to LACERS under the contract requiring PCA to perform this work.

344.   PCA knowingly failed to recommend "performance benchmarks" for the Securities Lending Program, while submitting bills for payment to LACERS under a contract

1    requiring PCA to perform this work.

2        345.    PCA knowingly failed to recommend guidelines for Norther Trust under the

3    Securities Lending Program, while submitting bills for payment to LACERS under a contract

4    which required PCA to perform this work;

5        346.    PCA knowingly failed to provide a quarterly or annual review of the historical

6    performance of the Securities Lending Program.

7        347.    PCA knowingly failed to follow, analyze, monitor and advise upon the investment

8    of LACERS' cash collateral in securities issued by Washington Mutual, Lehman, GreenPoint,

9    CIT and other investments.

10       348.    PCA knowingly failed to follow, analyze, monitor and advise upon the risks

11   associated with such investments.

12       349.    PCA knowingly submitted false claims to LACERS for payment of money,

13   knowing the PCA had not fulfilled the duties called for in its contract and in LACERS'

14   investment policy.

15       350.    As a proximate result of Northern Trust's actions, PCA caused damages in a

16   specific amount to be determined at trial.

17                         **PRAYER FOR RELIEF**

18       With respect to the PEOPLE's claims against Northen Trust under the California False

19   Claims Act:

20       1.    Three times the damages which LACERS sustained as a result of Northern Trust's

21   false claims in an amount to be determined;

22       2.    Civil penalties in the amount of $10,000 for each false claim pursuant to

23   Government Code §12651, subd. (a); and

24       3.    Attorneys fees and costs of suit, pursuant to Government Code § 12651, subd. (a)

25   and Code of Civil Procedure § 1033.5, subd. (a)(10).

26       With respect to the PEOPLE's claims against Northern Trust for Unfair Business

27   Practices:

28       1.    Pursuant to Business and Professions Code section 17203, that Northern Trust be

enjoined from committing acts of unfair competition as alleged in this Complaint;

2.      Pursuant to Business and Professions Code section 17203, that Northern Trust make full restitution to LACERS to restore all monies owing LACERS as a result of the Northern Trust's violations of Business and Professions Code section 17200 *et seq.* according to proof at trial.

3.      Pursuant to Business and Professions Code section 17206, that the Court assess a civil penalty of two thousand five hundred dollars ($2,500) against Northern Trust for each violation of Business and Professions Code section 17200 et seq., according to proof at trial.

4       For fees and costs of suit herein; and

5.      For such other and further relief as this honorable court may deem just and proper.

With respect to the PEOPLE's claim against PCA under the California False Claims Act:

1.      Three times the damages sustained as a result of PCA's false claims in an amount to be determined;

2.      Civil penalties in the amount of $10,000 for each false claim pursuant to Government Code §12651, subd. (a).

3.      Attorneys fees and costs of suit, pursuant to Government Code § 12651, subd. (a) and Code of Civil Procedure § 1033.5, subd. (a)(10).

With respect to the PEOPLE's claim against PCA for Unfair Business Practices:

1.      Pursuant to Business and Professions Code section 17203, that PCA make full restitution to LACERS to restore all monies owing LACERS as a result of PCA's violations of Business and Professions Code section 17200 *et seq.*, according to proof at trial.

2.      Pursuant to Business and Professions Code section 17206, that the Court assess a civil penalty of two thousand five hundred dollars ($2,500) against PCA for each violation of Business and Professions Code section 17200 et seq., according to proof at trial.

3.      For fees and costs of suit herein;

1    4.    For such other and further relief as this honorable court may deem just and proper.

2

3    Date:   February __, 2012                    CITY OF LOS ANGELES

4

5                                                 By:_____
                                                      CARMEN A. TRUTANICH
6                                                 Attorney for Plaintiff the People of the State of
                                                  California
7

8    Date:   February __, 2012                    STANZLER LAW GROUP

9

10                                                By:_____
                                                      JORDAN S. STANZLER
11                                                Attorney for Plaintiff the People of the State
                                                  of California
12

13                         **DEMAND FOR JURY TRIAL**

14        Plaintiff hereby demands a trial by jury on all issues triable to a jury.

15

16   Date:   February __, 2012                    CITY OF LOS ANGELES

17

18                                                By:_____
                                                      CARMEN A. TRUTANICH
19                                                Attorney for Plaintiff the People of the State
                                                  of California
20

21   Date:   February __, 2012                    STANZLER LAW GROUP

22

23                                                By:_____
                                                      JORDAN S. STANZLER
24                                                Attorney for Plaintiff the People of the State
                                                  of California
25

26

27

28

                                    Complaint
                                       72

                                                                    Exhibit A Page 85

# EXHIBIT   A

# CONTRACT 301

for

## *Master Custody Services*

Between

## *THE NORTHERN TRUST COMPANY*

and

### The Board of Administration
### Los Angeles City Employees' Retirement System
### Los Angeles, California

### Effective August 1, 2003
### through July 31, 2006



## LIST OF EXHIBITS

**Exhibit A**    **Affirmative Action Statement**
**Exhibit B**    **Insurance Requirements**
**Exhibit C**    **Certification of Compliance with Child Support Obligations**
**Exhibit D**    **Vendor Child Care Policy Program**
**Exhibit E**    **Americans with Disabilities Act**

CONTRACT 301

## THE NORTHERN TRUST COMPANY

### Custody

THIS is a CONTRACT made and entered into as of the first day of August 2003, by and between the BOARD OF ADMINISTRATION OF THE LOS ANGELES CITY EMPLOYEES' RETIREMENT SYSTEM, a municipal corporation (hereinafter referred to as "LACERS"), and THE NORTHERN TRUST COMPANY, an Illinois corporation, of Chicago, Illinois (hereinafter referred to as "Northern"). LACERS enters into this Contract pursuant to the authority of the Charter of the City of Los Angeles and the California State Constitution.

LACERS hereby retains Northern as a Master Custodian and Northern hereby accepts its retention as such upon the terms and conditions hereinafter set forth.

I.      SERVICES

(a)     Northern shall establish an account (the "Account") to hold such assets of the City Employees' Retirement Fund and the Limited Term Retirement Plan (together, the "Fund") as are transferred to it from time to time. LACERS and Northern agree that any additional plans or funds are outside the scope of this agreement.

(b)     LACERS shall direct Northern to establish and maintain one or more separate accounts ("Separate Account") for cash, securities and other property of the Fund received by Northern from time to time.  Each Separate Account shall be managed by either LACERS or an investment manager appointed by LACERS.  By written direction LACERS will (1) designate assets of the Fund to be allocated to each Separate Account and (2) direct Northern to transfer assets of the Fund to or from each Separate Account or between Separate Accounts.  With respect to cash deposited in Northern's banking department, the Separate Accounts are maintained as a matter of convenience and, therefore, Northern may aggregate the Separate Accounts for purposes of its depository requirements.

(c)     Northern shall appoint as its agent a foreign custodian(s) to hold the assets of any Separate Account established by LACERS for investment in foreign securities.

(d)     Until advised to the contrary Northern will assume that the assets of the Fund are exempt from taxation under Section 401 of the Internal Revenue Code and LACERS will promptly inform Northern of the loss of the tax exempt status of the Fund.

(e)     Northern shall hold and safeguard the cash, securities, and other property in the Fund and shall collect the income and principal thereof when due.

(f)    Northern may hold securities or other property of each Separate Account through an agent or in the name of its nominee or in a corporate depository or federal book entry account system or other form as it deems best.  Northern shall:  (1) For U.S. assets, forward any proxies relating to such securities or property to LACERS or LACERS' designee; (2) For assets denominated in currencies of any foreign countries from which Northern is unable to forward proxies, vote any proxies relating to such securities or property for management, unless otherwise directed by the investment manager, LACERS, or LACERS' designee; (3) For assets denominated in currencies of any foreign countries from which Northern is able to forward proxies on a timely basis, forward any proxies relating to such securities or property, to the investment manager, or, in the event there is no investment manager with respect to such assets, to LACERS, or LACERS' designee.

(g)    With respect to a Separate Account managed by LACERS, all security transactions shall be placed through brokers of its choice.  Each investment manager appointed by LACERS is, unless Northern is notified otherwise in writing by LACERS, authorized to execute security trades directly with respect to its respective Separate Account.   Northern is hereby directed to receive and pay for securities purchased in accordance with industry practices and to deliver in accordance with industry practice, securities sold by LACERS or by an investment manager, and shall rely on written or electronic advice from LACERS or the respective investment manager and corresponding broker's confirmation for such security trade.    Under no circumstance shall Northern pay any money to an investment manger except pursuant to instructions by LACERS.  Northern shall issue its operating instructions to LACERS and investment manager(s) as it deems appropriate.

(h)    Northern is authorized, but shall not be obligated, to credit the Account provisionally on payable date with interest, dividends, distributions, redemptions or other amounts due.  Otherwise, such amounts will be credited to the Account on the date such amounts are actually received by Northern and reconciled to the Account.  In cases where Northern has credited the Account with such amount prior to actual collection and reconciliation, LACERS acknowledges that Northern shall be entitled to recover any such credit on demand and further agrees that Northern may reverse such credit as of payable date if and to the extent that it does not receive such amounts in the ordinary course of business.  Northern may advance its own funds to complete transactions in cases where adequate funds may not otherwise be available to the Account.  In such situations Northern shall be entitled to repayment of any amounts advanced plus its applicable fee (which fee will be computed for the applicable period at the same "STIF" rate as uninvested funds in the Account would have earned from being invested in STIF for the same period) for advancing such funds. LACERS shall make Northern whole for any loss it may incur from granting such accommodations and acknowledges that Northern shall be entitled to recover any relevant amounts on demand from LACERS. All amounts thus due to Northern shall be paid by Northern from the Account unless otherwise paid on a timely basis and in that connection LACERS acknowledges that Northern has a continuing lien on assets of the

- 2 -

Account to secure such payments and agrees that Northern may apply or set off against such amounts any amounts credited by or due from Northern to LACERS.

(i)  Northern may execute and deliver as agent of LACERS and pursuant to LACERS' directions or the directions of a LACERS authorized investment manager, any assignments, stock or bond powers or other documents or instruments and, in particular (1) may sell, assign, transfer, or make other disposition of any security or other property in the Account in accordance with industry practice; (2) may obtain any payment due; and (3) may make payment in accordance with industry practices for any securities purchased or otherwise acquired. Northern may execute any and all documents by signing as agent of LACERS or as its attorney-in-fact pursuant to this authorization.

(j)  Subject to contrary instructions from LACERS or a LACERS authorized investment manager of LACERS, Northern shall invest United States Dollars held by Northern in the United States in a Separate Account on a short-term basis pending permanent investment. Northern is authorized to invest such United States Dollars so held in short term collective funds. Notwithstanding any other provision of this agreement, Northern may invest United States Dollars held by Northern in the United States in a Separate Account in its collective short term investment fund ("STIF") or pursuant to the direction of LACERS or a LACERS authorized investment manager, in any other collective fund maintained pursuant to Northern's collective trust fund which is maintained as a medium for the collective investment of funds of pension, profit sharing or other employee benefit plans including government plans, and which is qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended, and any assets invested in such collective trust fund shall be held and invested pursuant to all the terms and conditions of the trust agreement or declaration of trust establishing such trust, which are hereby incorporated by reference and shall prevail over any contrary provision of this agreement. For currencies other than United States Dollars, Northern shall invest cash as directed by LACERS, or a LACERS authorized investment manager, which may include Northern's short term collective funds or interest bearing accounts of a foreign custodian.

(k)  In connection with Northern's global custody service, LACERS will maintain deposits at Northern's London Branch. LACERS acknowledges and agrees that such deposits are payable only in the currency in which an applicable deposit is denominated; that such deposits are payable only on its demand at Northern's London Branch; that such deposits are not payable at any of Northern's offices in the United States; and that Northern will not in any manner directly or indirectly promise or guarantee any such payment in the United States. LACERS further acknowledges and agrees that such deposits are subject to cross-border risk, and therefore Northern will have no obligation to make payment of deposits if and to the extent that it is prevented from doing so by reason of applicable law or regulation or any Sovereign Risk event affecting the London Branch or the currency in which the applicable deposit is denominated. "Sovereign Risk" for this purpose means nationalization, expropriation, devaluation, revaluation, confiscation, seizure, cancellation, destruction or similar action

- 3 -

by any governmental authority, de facto or de jure; or enactment, promulgation, imposition or enforcement by any such governmental authority of currency restrictions, exchange controls, taxes, levies or other charges affecting the property rights of persons who are not residents of the affected jurisdiction; or acts of war, terrorism, insurrection or revolution; or any other act or event beyond Northern's control. LACERS ACKNOWLEDGES AND AGREES THAT DEPOSIT ACCOUNTS MAINTAINED AT FOREIGN BRANCHES OF UNITED STATES BANKS (INCLUDING, IF APPLICABLE, ACCOUNTS IN WHICH CUSTOMER FUNDS FOR THE PURCHASE OF SECURITIES ARE HELD ON AND AFTER CONTRACTUAL SETTLEMENT DATE), ARE NOT INSURED BY THE U.S. FEDERAL DEPOSIT INSURANCE CORPORATION; MAY NOT BE GUARANTEED BY ANY LOCAL OR FOREIGN GOVERNMENTAL AUTHORITY; ARE UNSECURED; AND IN A LIQUIDATION MAY BE SUBORDINATED IN PRIORITY OF PAYMENT TO DOMESTIC (U.S. - DOMICILED) DEPOSITS.    THEREFORE, BENEFICIAL OWNERS OF SUCH FOREIGN BRANCH DEPOSITS MAY BE UNSECURED CREDITORS OF THE NORTHERN TRUST COMPANY.  Deposit account balances that are owned by United States residents are expected to be maintained in an aggregate amount of at least $100,000 or the equivalent in other currencies.

(l)     If a corporation in which LACERS holds common stock declares a dividend in stock, and such payment results in a fractional share, Northern shall sell such fraction or if LACERS holds bonds and a distribution with respect to such securities is made in "baby" bonds, Northern shall sell such baby bonds.

(m)     In the event LACERS invests, or authorizes any LACERS authorized investment manager to invest, the assets of a Separate Account in financial futures, LACERS may direct Northern to (1) transfer initial margin to a futures commission merchant or third party safekeeping bank pursuant to directions from LACERS or a LACERS authorized investment manager and (2) pay or demand variation margin in accordance with industry practice to or from such futures commission merchant based on daily marking to market calculations.  Northern shall have no investment or custodial responsibility with respect to assets of any Separate Account transferred to a futures commission merchant or safekeeping bank.

(n)     Northern shall perform its responsibilities hereunder in a manner consistent with that of a professional custodian acting in the jurisdiction in which the assets are located with the care, skill, prudence, and diligence under the circumstances then prevailing that a professional custodian acting in like capacity and familiar with such matters would use.   Northern's duties hereunder shall be limited to those expressly set forth in this agreement.   Except as otherwise provided above regarding the short term investment of cash, Northern shall have no obligation to make any investment review or to consider the propriety of holding or selling any property in a Separate Account. Northern shall have no responsibility for any loss that may result from acting in accordance with this agreement, except to the extent such loss is the direct result of Northern's negligence or willful misconduct in the performance of its responsibilities under this agreement.

- 4 -

(o)     Northern shall furnish LACERS with monthly statements of accounting showing all receipts and disbursements and the property in each Separate Account and the market value thereof and monthly securities lending reports.   An account shall be approved by LACERS by written notice delivered to Northern or by failure to object to the account within eighteen (18) months of the date upon which the account was delivered to LACERS.   To the extent permitted by law, the approval of an account shall constitute a full and complete discharge to Northern to all matters set forth in that account.   In no event shall Northern or LACERS be precluded from having its account settled by a judicial proceeding.   In addition, pursuant to LACERS' request, Northern has created a stand-alone subset of LACERS' reports (which excludes real estate, private equity and commercial mortgages) in order to report specified performance information on a monthly basis as agreed upon between LACERS and Northern from time to time (the "Large Annuity Report").   Notwithstanding any other provision of this Contract to the contrary, Northern shall have no responsibility for any liability, cost, suit or expense (including reasonable attorneys' fees) incurred by LACERS, the Account or any other person, as a result of the use of the Large Annuity Report by LACERS' to make distributions hereunder, and, LACERS' shall indemnify Northern for any liability, cost, suit or expense (including attorneys' fees) incurred by Northern as a result of Northern's providing the Large Annuity Report, except to the extent such liability, cost, suit or expense is the direct result of Northern's negligence or willful misconduct in providing such report.

(p)     Northern shall make distributions from the Account to such persons, in such amounts, at such times and in such manner as LACERS shall from time to time direct in writing and LACERS warrants that any such directions shall be in compliance with applicable law.   Northern shall not be liable for any distribution made in good faith without actual notice or knowledge of the changed condition or status of any recipient and Northern shall have no obligation to search for or ascertain the whereabouts of any payee. If any distribution made by Northern is returned unclaimed, Northern shall notify LACERS and Northern shall dispose of such distribution as LACERS shall direct.

(q)     LACERS authorizes Northern to pay or withhold any income or other taxes payable on investments or transactions of the Account and, on a best efforts basis, to file for and obtain refunds of any taxes withheld to which the Account may be entitled under applicable tax treaties, laws and regulations.   LACERS shall provide Northern with any documentation and information it may reasonably require to perform its duties under this paragraph, and Northern may rely upon such documentation and information without further inquiry.

(r)     LACERS may appoint Northern as a lending fiduciary whereupon Northern shall lend securities of the account held by it, pursuant to a separate written agreement with the Board. As securities lending agent, Northern shall transfer the securities to the borrower and invest collateral received in exchange for the securities.

- 5 -

Notwithstanding anything in this agreement to the contrary, the borrower shall have the authority and responsibility to vote securities it has borrowed.

(s)   LACERS or any LACERS authorized investment manager may, in its discretion, engage Northern (or its affiliate) to execute foreign exchange transactions for the Account.  LACERS accepts that Northern may act as principal in such transactions, or as agent for the counterparty as well as for the Fund.  When Northern acts as agent Northern may levy charges for such service as set forth in its operating guidelines and instructions.  When Northern acts as principal, Northern will provide such service at rates established in its discretion having regard to rates available in the foreign exchange market on the global trading day, and may retain any profit derived from such service.  Northern is authorized to enter into master netting agreements with respect to any such foreign exchange transactions upon terms Northern (or its affiliate) deems appropriate.  If Northern determines that the assets of the Account are insufficient to provide adequate coverage in connection with any outstanding foreign exchange transactions executed on behalf of the Account, LACERS will, upon Northern's request, deliver to the Account immediately available funds or other assets acceptable to Northern in such amounts as Northern deems necessary to provide such coverage.

II.   TERMINATION

This Account may be terminated at any time upon 30 days written notice from LACERS to Northern or from Northern to LACERS and upon giving or receiving such notice Northern shall promptly deliver all cash, securities and other property then in the Account to LACERS or in accordance with its order.

III.   DURATION

The duration of this Contract shall be from August 1, 2003 through July 31, 2006 unless terminated during such period by either party pursuant to Section II of this agreement, provided, however, the terms of this agreement may be extended for additional three-year periods as the parties hereto may agree in a separate writing.

IV.   FEES

For its custodial services hereunder, Northern shall be compensated by LACERS through the fees it receives for providing short-term investment fund management, through the agreed upon Securities Lending 75%-25% revenue split, the agreed upon risk and performance services fee, through foreign exchange income arising from transactions initiated by LACERS investment managers, and for making distributions pursuant to Article I(p) above.

The Board agrees that Northern shall (a) receive ten (10) basis points on invested amounts under $300 million and eight (8) basis points on invested amounts equal to or greater than $300 million as compensation for management of short term cash as provided in I (j), (b) for its risk and performance services, be compensated



Exhibit A Page 101

$75,000 annually for providing Fund Analytics Enhanced Reporting; the analytical tools Fundamentals and Sherlock shall be provided at no additional fee; provide COMPLIANCE ANALYST services pursuant to a separate written agreement between LACERS and Northern, at no additional charge; (c)  offer the RiskGuide Summary Reporting and Detailed Reporting on one asset class each quarter at no additional fee, (d) provide other services as may be agreed upon by Northern and LACERS from time to time, (e) be reimbursed for any extraordinary expenses incurred from time to time by Northern in the management or protection of the Account with LACERS' prior approval, (f) pass through non-U.S. transaction costs of trade settlement (at cost) such as stamp duty, subcustodial reregistration, and delivery/receipt charges; and (g) be reimbursed for any legal fees incurred by Northern in defending itself successfully in regard to the Account.

V.     AFFIRMATIVE ACTION PROGRAM

        Northern agrees to abide by each and every requirement pertaining to an Affirmative Action Program as more specifically set forth in the provisions of Exhibit "A," which said exhibit is attached hereto and incorporated herein by express reference and may be modified from time to time in accordance with applicable federal and state laws.

VI.    INDEMNITY AND INSURANCE

        (a)    Indemnification.  Northern undertakes and agrees to indemnify and hold harmless LACERS and any and all of LACERS' officers, agents, employees, assigns and successors in interest against any direct loss to the Account, including reasonable attorneys' fees, reasonable costs of litigation and liabilities incurred in connection with suits or causes of action, resulting from Northern or its agents' negligence, willful misconduct or breach of this Agreement; provided, however, as to agents of Northern's which are subcustodians, Northern shall only reimburse the Account for any direct loss incurred by the Account as a result of a subcustodian's negligence or willful misconduct in the performance of duties delegated to it under this agreement, provided that the standard of care applied to a subcustodian shall be that which applies in the jurisdiction in which the subcustodian is acting.  As to any matter for which Northern is to act at the direction of an investment manager, LACERS, or LACERS' designee, Northern shall have no liability or duty to indemnify any person or entity for any losses or liabilities resulting from actions taken by Northern or its agent in accordance with such direction or from any failure by Northern or its agent to act in the absence of such direction where Northern has no discretion to act without a direction under this agreement.

        (b)    Insurance Conditions.  Northern shall provide insurance in accord with the insurance requirements indicated on Exhibit "C", which is attached hereto and incorporated herein by express reference, and shall provide proof of such insurance as requested by LACERS.

- 7 -

(c)     Worker's Compensation.    Northern agrees to provide Worker's Compensation coverage for its employees (if any) as applicable throughout the term of this agreement.

VII.    STATE OF JURISDICTION

The laws of the state of California shall govern the validity, interpretation and enforcement of this agreement.  The invalidity of any part of this agreement shall not affect the remaining parts hereof.

VIII.   AUTHORIZED AGENTS

LACERS shall certify to Northern the person or persons authorized to act on its behalf with respect to directions, approvals and notifications under this agreement.  Northern may conclusively rely on the authority of the person or persons named in the most recent certification filed with Northern until Northern receives written notice to the contrary.

IX.     ASSIGNMENT

The Contract may not be assigned by Northern without the express approval of LACERS.

- 8 -

X.    SIGNATORIES OF CONTRACT

Each of the individuals whose signature appears below warrants that he/she has full authority to execute this Contract on behalf of the party on whose behalf he/she has affixed his/her signature to this Contract.

THE NORTHERN TRUST COMPANY

Vice President

ATTEST:

BOARD OF ADMINISTRATION, LOS ANGELES CITY EMPLOYEES' RETIREMENT SYSTEM

Robert Aguallo, Jr., General Manager

Approved as to form:
**ROCKARD J. DELGADILLO, City Attorney**

_____, 2003

By: 
Michael R. Wilkinson, Deputy City Attorney

- 9 -